Crystal L. Cox
Pro Se Counter Plaintiff
Case 2:12-cv-02040-GMN-PAL
SavvyBroker@Yahoo.com

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
Case 2:12-cv-02040-GMN-PAL

Plaintiff Marc J. Randazza,

**Motion for Clarification on Defendants Media Status**

Defendant Crystal L. Cox

Plaintiff appears in this action "In Propria Persona" and asks that her points and authorities relied upon herein, and issues raised herein, be addressed "on the merits" and not simply on her Pro Se Status.

**Defendant Crystal L. Cox moves this court to clarify on whether this court considers Defendant Crystal L. Cox a Media Defendant of not, as a matter of law and statutes.**

Defendant Crystal L. Cox has claimed **retraction laws, shield laws, first amendment protection** in this court and has been denied. Defendant Crystal L. Cox has had this court give her media product, intellectual property, blogs, domain names to Plaintiff without First Amendment Adjudication and seeks clarification on this court's reasoning for stripping Defendant Crystal L. Cox of her intellectual property, online content, blogs, media, online free press and of exercising her right to free speech, first amendment rights, right to criticize Plaintiff Marc Randazza, and giving Plaintiff her online media.

Defendant Crystal L. Cox seeks clarification on reasons under **US Code and the Constitution** and Diversity, in which this court ruled as to completely sidestep the constitutional rights of Defendant Crystal L. Cox in her online media reporting on her former attorney Las Vegas Lawyer Plaintiff Marc J. Randazza.

Defendant Crystal L. Cox seeks matter of law, US code and constitutional law as to reasons this court gave away her property, deleted her blogs, redirected her domain names, and simply disregarded Defendant Crystal L. Cox's right to exercise free speech and her constitutional First Amendment right to parody, criticise, report on, and provide online content / media regarding Plaintiff Marc Randazza. Under what Nevada Laws, US codes and constitutional amendments did this court rule that Defendant Crystal L. Cox could not criticize, report on, make fun of, parody, report tips on, or provide online content in regard to Plaintiff Marc Randazza?

Why is Plaintiff Marc Randazza the only person in which Defendant Crystal L. Cox is not allowed by law to criticise, report on, have sucks sites of, exercise free speech of, exercise First Amendment rights of?  Why is Defendant Crystal L. Cox PUNISHED by this court, defamed, had her intellectual property given to Plaintiff without First Amendment Adjudication, as a matter of Nevada Law, Constitutional Law and U.S Codes as Defendant Crystal L. Cox is a resident of another state?

### Defendant Crystal L. Cox moves this court to rule on whether Defendant Crystal L. Cox has Media Status in this case?

Defendant Crystal L. Cox was reporting on Plaintiff Randazza and seeks protection under Constitutional Law and U.S Codes as Defendant Crystal L. Cox is a resident of another state. Defendant Crystal L. Cox moves this court to clarify Cox's media status, as a matter of law in this case.

Defendant Crystal L. Cox moves this courts as to if Nevada Shield Laws, NRS 49.275, Nevada Retraction Laws, Media Defendant Laws apples to Defendant Crystal L. Cox in this court, in this case?

### Privilege – First Amendment

The First Amendment privilege defense states that "Defendant has a privilege to report court-related matters effecting Plaintiff and Plaintiff's business and to report other business related events in the public record and is justified . . ." (D.E. 28 at 6.) The first amendment has been recognized as a basis for defending copyright claims. As stated in Suntrust Bank v. Houghon Mifflin, 268 F.3d 1257, 1265 and 1276 (11th Cir. 2001), "First Amendment protections [are] interwoven into the copyright law" and "the public interest is always served in promoting First Amendment values and in preserving the public domain from encroachment."

Why did this court violated the first amendment rights of Defendant Crystal L. Cox in favor of las vegas attorney, Plaintiff Marc Randazza?

Nevada Retraction Law, Nevada Shield Laws, Nevada SLAPP Laws, Nevada Media Status Laws Media Defendant Law have been invoked in this case by Defendant Crystal L. Cox and yet this court has not clarified as to Defendant Crystal L. Cox's media status.

This court removed massive online media content of Defendant Crystal L. Cox in order to SUPPRESS the First Amendment Rights of Defendant Crystal L. Cox and simply remove, redirect and delete massive online content of Defendant Crystal L. Cox that spoke harshly of Plaintiff Marc Randazza. Defendant Crystal L. Cox alleges this to be a violation of her First Amendment Rights and seeks clarification on this ruling, and these actions taken by this court.

**Defendant Crystal L. Cox specifically invokes Rule 5.1 of the Federal Rules of Procedure and invokes a constitutional challenge to this court as to the actions taken against the constitutional rights of Defendant Crystal L. Cox.**

## This is issue is of massive public interest.

RULE 5.1. CONSTITUTIONAL CHALLENGE TO A STATUTE—NOTICE, CERTIFICATION, AND INTERVENTION

(a) NOTICE BY A PARTY. A party that files a pleading, written motion, or other paper drawing into question the constitutionality of a federal or state statute must promptly:

   (1) file a notice of constitutional question stating the question and identifying the paper that raises it, if:

      (A) a federal statute is questioned and the parties do not include the United States, one of its agencies, or one of its officers or employees in an official capacity; or

      (B) a state statute is questioned and the parties do not include the state, one of its agencies, or one of its officers or employees in an official capacity; and

   (2) serve the notice and paper on the Attorney General of the United States if a federal statute is questioned—or on the state attorney general if a state statute is

questioned—either by certified or registered mail or by sending it to an electronic address designated by the attorney general for this purpose.

(b) CERTIFICATION BY THE COURT. The court must, under [28 U.S.C. §2403](), certify to the appropriate attorney general that a statute has been questioned.

(c) INTERVENTION; FINAL DECISION ON THE MERITS. Unless the court sets a later time, the attorney general may intervene within 60 days after the notice is filed or after the court certifies the challenge, whichever is earlier. Before the time to intervene expires, the court may reject the constitutional challenge, but may not enter a final judgment holding the statute unconstitutional.

(d) NO FORFEITURE. A party's failure to file and serve the notice, or the court's failure to certify, does not forfeit a constitutional claim or defense that is otherwise timely asserted.

## COMMITTEE NOTES ON RULES—2006

Rule 5.1 implements 28 U.S.C. §2403, replacing the final three sentences of Rule 24(c). New Rule 5.1 requires a party that files a pleading, written motion, or other paper drawing in question the constitutionality of a federal or state statute to file a notice of constitutional question and serve it on the United States Attorney General or state attorney general. The party must promptly file and serve the notice of constitutional question. This notice requirement supplements the court's duty to certify a constitutional challenge to the United States Attorney General or state attorney general. The notice of constitutional question will ensure that the attorney general is notified of constitutional challenges and has an opportunity to exercise the statutory right to intervene at the earliest possible point in the litigation. The court's certification obligation remains, and is the only notice when the constitutionality of a federal or state statute is drawn in question by means other than a party's pleading, written motion, or other paper.

Moving the notice and certification provisions from Rule 24(c) to a new rule is designed to attract the parties' attention to these provisions by locating them in the

vicinity of the rules that require notice by service and pleading.

Rule 5.1 goes beyond the requirements of §2403 and the former Rule 24(c) provisions by requiring notice and certification of a constitutional challenge to any federal or state statute, not only those "affecting the public interest." It is better to assure, through notice, that the attorney general is able to determine whether to seek intervention on the ground that the act or statute affects a public interest. Rule 5.1 refers to a "federal statute," rather than the §2403 reference to an "Act of Congress," to maintain consistency in the Civil Rules vocabulary. In Rule 5.1 "statute" means any congressional enactment that would qualify as an "Act of Congress."

**Defendant Crystal L. Cox's business has been altered, reputation damaged, online media damage and has suffered harassment, retaliation and threats due to the action of this court. Defendant Crystal L. Cox seeks clarification as to why her constitutional rights were denied.**

Defendant Crystal L. Cox seeks clarification of media status in this matter. This is an important distinction in this case.

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

Does this court deem Defendant Crystal Cox of having First Amendment Rights in this Court?

Does this court consider Defendant Crystal Cox a Media Defendant?

## This court Issued an Order that Violated Defendant Crystal Cox's Constitutional Rights.  Defendant Crystal Cox seeks clarification on the laws, U.S. Codes and constitutional implications that are a matter of law in this case.

A Judicial Order that prevents free speech from occurring is unlawful. ( Erwin Chemerinsky, Constitutional Law; Principles and Policies 918 (2002) ( "The Clearest definition of prior restraint is.. a judicial order that prevents speech from occurring:).

Prior Restraints are "the most serious and least tolerable infringement on First Amendment Rights." Neb. Press Ass'n v. Stewart, 427 U.S. 539, 559 (1976).  There is a "deep-seated American hostility to prior restraint" Id at 589 (Brennan, J. concurring).

Injunctive relief to prevent actual or threatened damage is heavily disfavored because it interferes with the First Amendment and amounts to censorship prior to a judicial determination of the lawlessness of speech. See Moore v. City Dry Cleaners & Laundry, 41 So. 2d 865, 872 (Fla. 1949). "The special vice of prior restraint," the Supreme Court held, "is that communication will be suppressed... before an adequate determination that it is unprotected by the First Amendment". Pittsburgh Press Co v. Pittsburg Comm'n on Human Relations, 413 U.S. 376, 390 (1973). Also se Fort Wayn Books Inc. v Indiana, 489 U.S. 46, 66 (1989); M.I.C., Ltd v Bedford Township, 463 U.S. 1341, 11343 (1983.)

"Prior Restraints are Unconstitutional. Also see Post-Newsweek Stations Orlando, Inc. v. Guetzlo.

"RKA sought extraordinary relief in the form of prior restraint to enjoin .. . This relief is not recognized in this State, nor anywhere else in the Country.  In addition to ignoring the First Amendment Rights and almost a century's worth of common law, the .. court ignored virtually all procedural requirements for the issue of a preliminary injunction." Page 5 Paragraph ii of Opening Brief Appellate Case No. 3D12-3189, Irina Chevaldina Appellant vs. R.K./FI Management Inc.;et.al., Appellees. Attorney for Appellant Marc J. Randazza Florida Bar No. 325566, Randazza Legal Group Miami Florida

### As a matter of law and constitutional rights, Defendant Crystal Cox's First Amendment Rights MUST Be Adjudicated Before this court Can Seize a Domain Name or Defendant's Media Content.

"If a court issues an injunction prior to adjudicating the First Amendment Protection of the speech at issue, the injunction cannot pass constitutional muster."

If Domain Names, Sites, Online Media Content are SEIZED before the First Amendment is Adjudicated or Considered a Factor in the case and thereby "expressly skipping the essential step of adjudicating the First Amendment protections to the speech at issue.", then this is a violation of law and constitutional rights. Defendant Crystal Cox has a right to relief by this court for such actions already taken against the constitutional rights of Defendant Crystal Cox.

### Plaintiff Marc Randazza EXPLOITED his Own Child and Should be Reported to Social Services. Yet this court favors the Constitutional rights of Plaintiff Marc Randazza over pro se litigant, Defendant Crystal Cox

Plaintiff Marc Randazza has been favored by this court even though, upon knowledge and belief he has violated rules of procedure and subjected his own child as collateral damage in his revenge, retaliation against an ex-client criticising him. Rule of procedure say that names of persons under the age of 18 must include initials only, yet Plaintiff Marc Randazza has used his minor child as a weapon in the courts, and under complete falsehoods, as when Plaintiff Marc Randazza filed this legal action, he himself owned the domain name associated to the child and Defendant Cox NEVER had written one word regarding this minor.

Yet Plaintiff Marc Randazza named her in this case and now her name is everywhere, so is her photos as put out to media by Plaintiff Marc Randazza himself. This should be reported as child exploitation in order for him to gain financial advantage, steal valuable search engine placement, delete blogs and online media that criticised him and violate the lawful and constitutional rights of Defendant Crystal L. Cox using his own child as a weapon in the courts and the media to destroy the life and reputation of Defendant Crystal L. Cox, with total disregard for the TRUTH.

**The Supreme Court recognizes the extreme importance of Freedom of Speech, yet this Nevada court completely violated the free speech rights and constitutional rights of Defendant Crystal Cox.  Cox seeks clarification on constitutional statutes that give this court the power to act as it has and to determine if this court considers Defendant Crystal Cox of having Media Status.**

The Supreme Court has recognized the threat to freedom of speech. In Cohen v. California, 403 U.S. 15, 25, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971), it was decided that the right to speak freely that is guaranteed by the First Amendment to the Constitution of the United States includes the right to criticize others, voice highly controversial opinions, and comment on public interest matters. The First Amendment also protects free speech of extreme statements and intentional exaggeration when it is clear the statements are insincere and done to frustrate the target, and is not defamation but opinion, satire, or parody.

The first step with free speech and the First Amendment and trademark law is whether the speech in question is commercial or noncommercial. Commercial speech is bound by the laws of the Lanham Act and is subject to less and sometimes no First Amendment protection. Noncommercial speech is not bound by the Lanham Act or trademark law, and is guaranteed complete and full First Amendment protection. In fact, trademark law specifically exempts noncommercial speech so that the law will not infringe on the First Amendment. One case that supports this paragraph is Taubman Co. v. Webfeats, 319 F.3d 770, 774-75 (6th Cir. 2003). Another supporting precedent is Nissan Motor Co. v. Nissan Computer Corp., 378 F.3d 1002, 1015-18 (9th Cir. 2004).

There are many cases supporting that negative consumer commentary is core speech protected by the First Amendment. Another case supporting this is, Bose Corp. v. Consumers Union, 466 U.S. 485 (1984) Many other cases treat criticisms of a company, their business practices, products and services, as speech protected by the First Amendment. Criticism would be pointless if the person cannot name the company they are bashing by using its trademarks. The Fourth Circuit explained that just because speech is critical of a corporation or company and its business practices, it is not a sufficient reason to prevent or enjoin the speech. If a trademark owner could "enjoin the use of his mark in a noncommercial context found to be negative or offensive, then a corporation could shield itself from criticism by forbidding the use of its name in commentaries critical of its conduct." CPC Int'l., Inc. v. Skippy Inc., 214 F.3d 456, 462 (4th Cir. 2000) (quoting L.L. Bean v. Drake Publishers, 811 F.2d 26, 33 (1st Cir. 1987)).

Congress has decided that the Lanham Act ONLY applies to commercial speech. Under § 43 (15 U.S.C. §1125) explicitly defines that noncommercial use is not actionable. "The following shall not be actionable under this section: . . . (B) Noncommercial use of the mark."

15 U.S.C. § 1125(a) (1). The Lanham Act defines "use in commerce" as meaning "bona fide use of a mark in the ordinary course of trade," such as using the mark in conjunction with services or goods in commerce. 15 U.S.C. § 1127. Without "use in commerce" "in connection with goods and services," there is no trademark infringement. Int'l Bancorp, LLC v. Societe des Bains de Mer et duInternational Bancorp, LLC, 329 F.3d 359, 363 (4th Cir. 2003); People for Ethical Treatment of Animals (PETA) v. Doughney, 263 F.3d 359, 365 (4th Cir. 2001); see also S. Rep. No. 100-515, at 44 (1988), reprinted in 1988 U.S.C.C.A.N. 5577, 5607 ("Amendment of the definition of 'use in commerce' [in § 45 of the Lanham Act) is one of the most far-reaching changes the legislation contains. . . . The committee intends that the revised definition of 'use in commerce' be interpreted to mean commercial use which is typical in a particular industry."). Basically, the Lanham act excludes all noncommercial speech. Nissan, 378 F.3d at 1016-17; see also TMI, Inc. v. Maxwell, 368 F.3d 433, 436-38 (5th Cir. 2004), and even excludes commercial speech that does not use marks "in connection with goods or services." PETA, 263 F.3d 359, 365 (4th Cir. 2001).

Despite many corporations using intimidation to try to silence people from speaking their minds and using lawsuits, and threats of lawsuits, the Constitution continuously protects free speech.

It excludes commercial speech precisely for the purpose of avoiding infringement of First Amendment rights. Taubman, 319 F.3d at 774-75 (6th Cir. 2003); Nissan, 378 F.3d at 1016-17. Thus, when an action is brought against a noncommercial use of a trademark for either political or consumer commentary, such as the SLAPP cases with Walmart, Starbucks, and others, the courts do not usually hesitate to grant the defendant full First Amendment protection by holding that trademark law does not apply and that First Amendment protects such speech. See CPC Int'l, 214 F.3d at 461-64 (4th Cir. 2000); Nissan, 378 F.3d at 1017-18 (9th Cir. 2004); L.L. Bean, 811 F.2d at 33.

Noncommercial Speech Is NOT Subject to Trademark Law AND Is Fully Protected by the First Amendment. Trademark law explicitly exempts noncommercial speech such as the alleged emails and website(s) precisely so that the law will not run afoul of the First Amendment. Taubman, 319 F.3d at 774 (6th Cir. 2003); Nissan, 378 F.3d at 1016-17 (9th Cir. 2004). Numerous cases show that consumer commentary is core speech protected by the First Amendment. See, e.g., Bose Corp. v. Consumers Union, 466 U.S. 485 (1984) (New York Times standard applied in libel action brought by a manufacturer claiming that consumer group had maligned its product). Many other cases similarly treat criticisms of a company's products or business practices as speech protected by the First Amendment. The criticisms would be pointless if they did not identify the company they were criticizing and by using its trademarks. The Fourth Circuit explained: This is an admittedly partisan account and one that vexes [the plaintiff]. Yet just because speech is critical of a corporation and its business practices is not a sufficient reason to enjoin the speech.

As the First Circuit stated, if a trademark owner could "enjoin the use of his mark in a noncommercial context found to be negative or offensive, then a corporation could shield itself from criticism by forbidding the use of its name in commentaries critical of its conduct." CPC Int'l., Inc. v. Skippy Inc., 214 F.3d 456, 462 (4th Cir. 2000) (quoting L.L. Bean v. Drake Publishers, 811 F.2d 26, 33 (1st Cir. 1987)). Congress has therefore limited the application of the Lanham Act to commercial speech. First, § 43(c) expressly excludes noncommercial use of marks from the entire section's reach: "The following shall not be actionable under this section: . . . (B) Noncommercial use of the mark." 15 U.S.C. § 1125(c) (4) (emphasis added). Section (c) (4) was added to the Act when it was amended in 1989. The House Judiciary Committee made explicit that the purpose was to avoid any impact on noncommercial speech: The proposed change in Section 43(a) should not be read in any way to limit political speech, consumer or editorial comment, parodies, satires, or other constitutionally protected material. . . .

## "First Amendment rights trump Trademark law." is a massively important issue, YET this court neglected to first adjudicate the first amendment rights at issue before permanently destroying massive online media content created and owned by Defendant Cox.

"THE LANHAM ACT AS IT APPLIES TO DOMAIN NAME DISPUTES
The Lanham Act was originally enacted as the Trademark Act of 1946. It has been amended several times. It is codified at 15 U.S.C. §§ 1051-1127.1
The Lanham Act provides remedies for both trademark infringement and trademark dilution. There is now, in addition, theAnticybersquatting Consumer Protection Act of 1999.2 These are all discussed below.

A. INFRINGEMENT

Trademark infringement occurs when a non-owner uses another's trademark in a way that causes actual confusion or a likelihood of confusion between the marks. Specifically, the Act prohibits the use of marks that are "likely to cause confusion, or to cause a mistake, or to deceive."3In order to establish infringement, a plaintiff must first show its own actual trademark use. That is, it cannot simply register and then warehouse a trademark in hopes of some day bringing an infringement suit. The plaintiff must also show that the trademark is distinctive. Finally, it must show that the defendant's use of a mark is non-functional. A mark is non-functional when it is not inherent to the purpose or description of what it is representing. (For example, "bandage" is functional; "Band-Aid" is non-functional.)

B. DILUTION

Trademark dilution is less concrete than infringement. In order to understand it, one must be familiar with a number of terms of art. In a dilution case, there is a "senior user" and a "junior user." The senior user is the entity that used the mark first, and is almost always the plaintiff in a

dilution case. The junior user is the entity that subsequently uses the mark. The junior user is usually the defendant in a dilution case.A dilution case involves use of a mark in a "commercial context." This means that the use in question must actually be in the stream of commerce and could therefore make a profit for the user.

Dilution deals with marks as a "source indicators." This term refers to the ability of a mark to identify a user and/or its products and services. One of the most important aspects of using marks as source indicators is the reputation of a user and how that affects the public's perception of the mark.

Dilution occurs when a junior user uses a senior trademark user's mark in a commercial context in a way that lessens the power of the senior user's mark as a source indicator.4
There are two forms of dilution.

The first is dilution by tarnishment, which is the diminishing of the power of the senior user's mark because of its association with the negative aspects or connotations of the junior user's use of the mark.

The second is dilution by blurring, which is when the power of the senior user's mark is decreased because of the blurring of the mark's distinctive quality caused by the existence of the junior user's mark.

In a dilution cause of action, the plaintiff must show that its mark is famous and that the junior user is using its mark in a commercial context. In order to determine whether a mark is famous, Congress set out eight nonexclusive factors that a court may consider.

There are three uses that Congress made non-actionable under the dilution section of the Lanham Act. They are, briefly, fair use of a famous mark for comparative advertising or promotion, noncommercial use, and all forms of news reporting and commentary.6
C. CYBERPIRACY PREVENTION

The ACPA provides a cause of action similar to a dilution claim, but one with its own unique elements.The first difference is that the plaintiff's mark need not be famous. It need only be protected.7
A plaintiff can establish liability by showing the following. The plaintiff must show that the defendant has a bad faith intent to profit from the mark. The plaintiff must also show that the defendant has registered, trafficked in, or uses a domain name that is identical to, confusingly similar to, or in the case of a famous mark, is dilutive of the plaintiff's mark.8 Congress provided nine non-exclusive factors for a court to consider in order to determine bad faith under this section.9

The ACPA applies not only to protected marks, but also to protected personal names.10 The Cyberpiracy Protection for Individuals Act,11 which applies specifically to "any person who

registers a domain name that consists of the name of another living person, or a name substantially and confusingly similar thereto, without that person's consent, with the specific intent to profit from such name by selling the domain name. . ."12

Generally, the remedy for a trademark violation is injunctive. In the case of the ACPA, Congress allowed courts to order the cancellation or forfeiture of domain names that violate the trademark owner's rights.13

III. "SUCKS.COM" CASES UNDER THE LANHAM ACTTo date, there have been two "sucks.com" cases decided under the Lanham Act. It is very unlikely that there will be any more. In Bally Total Fitness Holding Corp. v. Faber,14 Bally brought a trademark infringement and dilution suit against Faber after Faber created and registered a website called www.compupix.com/ballysucks. This site, which no longer exists, was dedicated to complaints about Bally. The case was resolved before the ACPA was enacted.

The court immediately concluded that there was no likelihood of confusion between Bally and Ballysucks.com because they are not "related goods" and dismissed the infringement claim.

Although the court dismissed the infringement claim, it still discussed how the case would come out under the most common likelihood of confusion test, found in AMF Inc. v. Sleekcraft Boats.15 The court most likely did this because this was the first case of its kind and the court wanted to establish some official position on the matter.

The Sleekcraft test uses eight factors to determine whether a defendant's use of a plaintiff's trademark creates a likelihood of confusion. The factors are:
Strength of the mark
Proximity of the goods
Similarity of the marks
Evidence of confusion
Marketing channels used
Type of goods and the degree of care likely to be exercised by the purchaser
Defendant's intent in selecting the mark
Likelihood of expansion of the product lines

The court found that Bally has strong marks, as evidenced by the amount of money spent on advertising and the fact that no other health club company uses the Bally mark. This factor came out in favor of Bally.The court found that the similarity of marks factor leaned in favor of Faber. Bally argued that the marks are identical or that adding "sucks" on the end of "Bally" is a minor change. The court found that "sucks" is such a loaded and negative word that the attachment of it to another word cannot be considered a minor change.

Bally asserted that the goods were in close proximity because both used the Internet and because it had a complaint section on its own website. The court found, however, that the sites

did not compete, even though they were both on the Internet. This is because Bally's is a commercial site while Faber's site is for the purpose of consumer commentary. The factor leaned in favor of Faber.

Bally presented no evidence of actual confusion. Bally argued that the confusion would be patently obvious due to the similarity of the marks. The court, however, found that a reasonably prudent user would not mistake Faber's site and the official Bally's site. This factor leaned in favor of Faber.

Bally argued that the marketing channels used, namely the Internet, were identical. The court found that the overlap of marketing channels was irrelevant because Faber's site was not a commercial use of the mark. This factor was neutral or slightly in favor of Faber.

Bally argues that an Internet user may accidentally access Faber's site when searching for Bally's site on the web. The court dismissed this because Faber does not actually use Bally's trademark. It further points out that an Internet user searching with a search engine may want all the information available on Bally's and is entitled to more than Bally's own site. This factor leaned in favor of Faber.

The court found, and Bally agreed to some extent, that in the context of consumer commentary, Faber was entitled to use Bally's mark. In fact, he had to use Bally's mark in some way to identify what he was criticizing. This factor was neutral.

Bally conceded that there was no likelihood of the two parties expanding into each other's lines of business. For this reason, the last factor leaned in favor of Faber.

In concluding its discussion of likelihood of confusion, the court stated that "applying Bally's argument would extend trademark protection to eclipse First Amendment rights. The courts, however, have rejected this approach by holding that trademark rights may be limited by First Amendment concerns."

Under the dilution claim, Bally argued that there was dilution by tarnishment because Faber also had pornographic websites linked from the compupix.com site.

The court found that Faber had engaged in no commercial use of the Bally name due to the nature of the website. The court also concluded that there was no tarnishment. In so deciding, the court said that if tarnishment existed in this case, "it would be an impossible task to determine dilution on the Internet."[19] The court went on to point out that to include "linked sites as grounds for finding commercial use or dilution would extend the statute far beyond its intended purpose of protecting trademark owners from use that have the effect of 'lessening. . . the capacity of a famous mark to identify and distinguish goods or services.'"[20]
For these reasons, the court ruled in favor of Faber.

In the other "sucks.com" Lanham Act, Lucent Technologies, Inc. v. Lucentsucks.com,21 the court did not get beyond the jurisdictional issues to reach the merits. However, the court acknowledged in dicta that had the case reached the merits, the court probably would have reached a decision similar the one reached in Bally.

The remaining "sucks.com" cases have been decided under the UDRP.

IV. THE UNIFORM DOMAIN NAME DISPUTE RESOLUTION POLICYOn October 24, 1999, ICANN adopted its Uniform Domain Name Dispute Resolution Policy.23 Since then, the UDRP has been used by domain name dispute resolution panels, most notably those associated with WIPO, to rule on domain name disputes. A number of these disputes have involved "sucks.com" websites.

Part of the registration process for a getting a domain name includes acceptance of the UDRP. A domain name owner can lose its rights to the domain name if it violates the UDRP.24 Section 4 of the UDRP explains the mandatory administrative proceeding that any domain name owner could be subject to. This proceeding occurs when a third party complainant asserts that the domain name owner has used a domain name that is identical or confusingly similar to the complainant's mark, that the domain name owner does not have rights or legitimate interests in the name, and that the domain name has been registered and used in bad faith.

The UDRP lists four non-exclusive factors to be considered in determining bad faith.

The remedies sought in a UDRP proceedings are the cancellation of the domain name or the transfer of the domain name to the complainant owner of the mark.

The UDRP proceeding does not prevent its loser from taking the case to court following the conclusion of the proceeding.

V. "SUCKS.COM" CASES UNDER THE UDRPA number of "sucks.com" cases have been heard by panels using the UDRP's mandatory administrative procedure. These hearings have come out strongly in the opposite direction from the court cases under the Lanham Act.

At one point, in fact, nine of the eleven "sucks.com" cases heard under the UDRP, had been decided in favor of the original mark owner, with the other two hearings awaiting decisions.

A notable recent example of a UDRP hearing is Diageo plc v. John Zuccarini, Individually and t/a Cupcake Patrol.Diageo, formerly known as Guinness plc, the owner of the company and brewery that produces Guinness beer, brought this proceeding against Zuccarini after Zuccarini registered eleven domain names, all variations on the theme of "Guinness beer sucks."

Previously, Diageo had brought a hearing against Zuccarini for his registration of guinnes.com. It claimed that Zuccarini's registration of the eleven Guinness _____sucks.com sites were in direct retaliation for its having done this.

In deciding on Zuccarini's liability, the panel first looked at the question of whether the domain names were identical or confusingly similar to Diageo's mark. Because the marks were not identical, the panel looked to whether they were confusingly similar. The panel decided that the domain names were confusingly similar.

In doing so, it relied on precedent from a previous hearing in which a panel held that "the confusingly similar test may be held to a different standard when used with Internet search engines."

The panel also used the same Sleekcraft test for likelihood of confusion that the court used in Bally.35 However, the panel acknowledged that there were some difficulties in applying the test to a domain name dispute. Nevertheless, because neither party objected, the test was used.36 The panel found that Diageo had a very strong mark.

The panel found that although the parties were in different line of trade, the fact that there were beer references in a number of Zuccarini's domain names was enough to establish some kind of proximity.

The panel found that because the word "guinness" appeared at the beginning of each of the domain names, there was at least some similarity between the marks.

There was no evidence of actual confusion. However, the panel found that it was unrealistic to require such evidence, especially because Zuccarini's domain names had not actually been used for active websites.

When considering the marketing channels, the panel again pointed out the distinction between trademarks and domain names. It did accept, however, the assertion that a search using a search engine would likely point out the domain names in dispute.

The panel was unsure of how to interpret the question of the degree care exercised by the purchaser. Of particular concern was the fact that "sucks" is an American slang word and may not be familiar to all English speakers, let alone all Internet users. Because of this, the panel envisioned "circumstances where Internet users are not aware of the abusive connotations of the word and consequently associate the domain name with the owner of the trademark."

The panel found that Zuccarini had no legitimate reason to select the marks to use for the domain name and that there was no evidence of any likelihood that either party would expand its product lines.

Based on its consideration of the UDRP standards and the Sleekcraft factors, the panel decided that Zuccarini had no legitimate interest in the Guinness name, and that his registering the "sucks.com" websites was primarily to disrupt Diageo's business and was therefore done in bad faith.

Based on its findings, the panel ordered that all eleven domain names be transferred to Diageo. While the panel did decide in favor of the Diageo, it did so at least in part because Zuccarini made no response to Diageo's allegations, which the panel felt established prima facie cases for the elements needed under the UDRP.

The Bally court focused in the end on the fact that First Amendment rights trump Trademark law. The panel in this case was more concerned by the fact that a test designed for trademark law was used in a decision also involving domain names, stating that "it is obvious that there remains many areas of doubt as to how the various elements of the test can be transposed in its application to disputes involving a comparison of domain names and trademarks."

## Defendant Cox suspects Fraud on this Court and seeks Clarification, as a matter of law

In the United States, when an officer of the court is found to have fraudulently presented facts to court so that the court is impaired in the impartial performance of its legal task, the act, known as "fraud upon the court", is a crime deemed so severe and fundamentally opposed to the operation of justice that it is not subject to any statute of limitation.

Officers of the court include: Lawyers, Judges, Referees, and those appointed; Guardian Ad Litem, Parenting Time Expeditors, Mediators, Rule 114 Neutrals, Evaluators, Administrators, special appointees, and any others whose influence are part of the judicial mechanism.

"Fraud upon the court" has been defined by the 7th Circuit Court of Appeals to "embrace that species of fraud which does, or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication". Kenner v. C.I.R., 387 F.3d 689 (1968); 7 Moore's Federal Practice, 2d ed., p. 512, ¶ 60.23

In Bulloch v. United States, 763 F.2d 1115, 1121 (10th Cir. 1985), the court stated "Fraud upon the court is fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury. ... It is where the court or a member is corrupted or influenced or influence is attempted or where the judge has not performed his judicial function --- thus where the impartial functions of the court have been directly corrupted."

What effect does an act of "fraud upon the court" have upon the court proceeding? "Fraud upon the court" makes void the orders and judgments of that court."

### Relief Requested of this Court

Defendant Crystal Cox requests this court rule on her Media Status, as to whether this court is treating Cox as a Media Defendant or not and if not, which laws, constitutional rights and / or US Codes apply to this matter in the rulings of this court.

Defendant Crystal Cox challenges the constitutional issues of orders in this case that have violated her rights, per Rule  **Rule 5.1 of the Federal Rules of Procedure.**

### CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed using this Court's CM/ECF system **On April 28th 2013**.

Respectfully Submitted
Pro Se Defendant
Pro Se Counter Plaintiff
Crystal L. Cox
**Case 2:12-cv-02040-GMN-PAL**