UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
2:12-cv-02040-JAD-PAL



CRYSTAL L. COX,
Defendant, Counter Plaintiff

v.

MARC J. RANDAZZA,
Plaintiffs, Counter Defendant

Motion in Limine
to Include Exhibit 2 WIPO Decision

Counter Plaintiff Cox moves this court to rule on the inclusion of Exhibit 2. Exhibit 2 is a WIPO decision of Nov. 2012. However, Randazza submitted false sworn statements to WIPO on July 26th 2012, through his attorney Ronald Green.

WIPO used this signed complaints to publish false and defamatory statements in an extremely, worldwide credible publication, claiming that Cox and Bernstein were guilty of extortion, simply because Randazza said so and with no adjudication whatsoever.

Randazza swore to WIPO that Cox had extorted him and did all the things published worldwide in Exhibit 2. Randazza made false and defamatory statements to third parties, willfully and wanton and with full knowledge that they were not true.

Marc Randazza is friends with Trademark attorney Peter Michaelson (INTA). He has been seen with him at INTA meetings. Peter Michaelson was the Sole WIPO panelist that decided on this decision. He took Marc Randazza at his word, because he knew him and trusted him.

This exhibit proves the damage Randazza caused Cox, and that he made false statements to WIPO

Randazza got the New York Times, Philly Law Blog, Forbes and others to post defamatory statements about Cox, then he used those articles as exhibits in his WIPO complaint.

Exhibit 2 is the WIPO Decision and the Original Complaint proving Randazza is guilty of defamation against Cox, and also Malpractice as he was her attorney at the time she bought MarcRandazza.com to report on her high profile First Amendment case.

Cox wishes this court to include Exhibit 2 and 2a (Complaint) as exhibits in proving her counterclaims.

Crystal L. Cox, Pro Se
Counter Plaintiff / Defendant

## Certification of Service

On April 2, 2015, Crystal Cox certifies mailing a copy of this to:

U.S. District Court
Clerk of Court
Room 1334
333 Las Vegas Blvd. S.
Las Vegas , NV 89101

# WIPO

**WORLD INTELLECTUAL PROPERTY ORGANIZATION**

# WIPO Arbitration and Mediation Center

## ADMINISTRATIVE PANEL DECISION

## Marc J. Randazza v. Reverend Crystal Cox, Eliot Bernstein

## Case No. D2012-1525

### 1. The Parties

The Complainant is Marc J. Randazza of Las Vegas, Nevada, United States of America, represented by Randazza Legal Group, United States of America.

The Respondents are Reverend Crystal Cox (hereinafter "Respondent Cox") of Eureka, Montana, United States of America; and Eliot Bernstein (hereinafter "Respondent Bernstein") of Boca Raton, Florida, United States of America.

### 2. The Domain Name and Registrar

The disputed domain names <marcjohnrandazza.com>, <marcjrandazza.com>, <marcrandazza.com>, <marcrandazza.biz>, <marcrandazza.info> and <marcrandazza.mobi> are all registered with GoDaddy.com, LLC. (the "Registrar").

### 3. Procedural History

A Complaint, concerning three of the disputed domain names, specifically <marcjohnrandazza.com>, <marcjrandazza.com> and <marcrandazza.com>, was filed with the WIPO Arbitration and Mediation Center (the "Center") on July 27, 2012. On July 27, 2012, the Center transmitted by email to the Registrar a request for registrar verification in connection with those three disputed domain names. On July 31, 2012, the Registrar transmitted by email to the Center its verification response confirming that the Respondents are listed as the registrants of those disputed domain names and providing the contact details.

The Center verified that the Complaint satisfied the formal requirements of the Uniform Domain Name Dispute Resolution Policy (the "Policy"), the Rules for Uniform Domain Name Dispute Resolution Policy (the "Rules"), and the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy (the "Supplemental Rules").

In accordance with the Rules, paragraphs 2(a) and 4(a), the Center formally notified the Respondents of the Complaint, and the proceedings commenced on August 7, 2012. In accordance with the Rules, paragraph 5(a), the due date for Response was August 27, 2012. The Respondents did not submit any response. Accordingly, the Center notified the Respondents' default on August 28, 2012.

On August 14, 2012, the Center further received supplemental filings from the Complainant.

*Exhibit 2*

The Center appointed Peter L. Michaelson as the sole panelist in this matter on September 7, 2012. The Panel finds that it was properly constituted. The Panel has submitted the Statement of Acceptance and Declaration of Impartiality and Independence, as required by the Center to ensure compliance with paragraph 7 of the Rules.

On September 7, 2012, the Complainant filed a request with the Center to add three additional domain names to the proceeding, specifically <marcrandazza.biz>, <marcrandazza.info> and <marcrandazza.mobi>.

Through Administrative Panel Procedural Order No. 1 dated September 14, 2012 (hereinafter simply "Procedural Order"), the Panel, *inter alia*: (a) granted the Complainant's request to add the three additional domain names, and required the Complainant to file an amended Complaint pursuant to paragraph 3 of the Rules, within five days of receipt of the Procedural Order, and which provides any additional information regarding these additional domain names, (b) required the Center to obtain registrar verification of these additional domain names, and (c) following receipt of the verification response, provided the Respondents with a 20 day interval, pursuant to paragraph 5 of the Rules, to submit a supplemental response in relation to the newly added domain names. The Panel's decision would then be due within 14 days of the Center's receipt of the supplemental response.

On September 19, 2012, the Complainant filed an amended Complaint (as the amended Complaint appears to contain all the information set forth in the original Complaint, then, for simplicity, all further reference herein to the Complaint will be to the amended Complaint unless specifically stated to the contrary). On September 20, 2012, the Center transmitted by email to the Registrar a request for registrar verification in connection with the additional domain names. On September 21, 2012, the Registrar transmitted by email to the Center its verification response confirming that Respondent Cox is listed as the registrant of the additional domain names and providing the contact details. On September 27, 2012, the Center forwarded the amended Complaint to the Respondents. Accordingly, under the Procedural Order, the Respondents' supplemental response was due on October 17, 2012. Subsequently, the Complainant filed a supplemental filing on October 11, 2012 with the Center.

Though the Respondents did not file a formal response as such, nevertheless over the ensuing days and ending on October 17, 2012, Respondent Cox filed with the Center a significant number of documents, including an explanation underlying her position. The Panel will treat all this material as the Supplemental Response.

As such, the due date for the Panel's decision was October 31, 2012. Due to extraordinary circumstances, specifically the significant devastation to the New Jersey coastal area (proximate to where the Panel is located) caused by Hurricane Sandy shortly before that date and the ensuing disruption to the Panel's normal activities resulting by the aftermath of the hurricane, the Panel has extended the deadline for its decision to the date indicated under its orders in paragraph 7 below.

## 4. Factual Background

According to extracts of the public WhoIs database appearing in Annex A to the Complaint, confirmed by the Registrar in its verification responses, the disputed domain names have the following registration and expiration dates: <marcrandazza.com> – December 10, 2011 and December 10, 2012;

Exhibit 2

<marcjrandazza.com> – March 12, 2012 and March 12, 2013; <marcjohnrandazza.com> – March 12, 2012 and March 12, 2013; <marcrandazza.biz> – June 25, 2012 and June 24, 2013; <marcrandazza.info> – June 25, 2012 and June 25, 2013; and <marcrandazza.mobi> – June 25, 2012 and June 25, 2013.

## A. The Complainant's RANDAZZA Marks

Though the Complainant has no trademark registration for a mark containing his full name MARC JOHN RANDAZZA, his full name but with an abbreviated middle initial MARC J. RANDAZZA, his given name and surname MARC RANDAZZA or just his surname RANDAZZA (the "RANDAZZA Marks"), he is nonetheless asserting that he has acquired common law trademark rights since 2006 in his each of these marks in connection with both his and his law firm's rendering of legal services as well as for his own commentary and publishing. The Complainant's law firm utilizes the tradename RANDAZZA LEGAL GROUP, of which the Complainant's surname is a prominent formative.

## B. The Complainant and his activities

The Complainant's law firm, Randazza Legal Group, represents clients throughout the United States of America (US) on legal matters involving the First Amendment and related issues, and as a result has gained nationwide notoriety.

In 2008, the Randazza Legal Group incorporated as Marc J. Randazza PA ("MJRPA"). Since 2008, MJRPA has conducted business under the mark RANDAZZA LEGAL GROUP and Marc Randazza's personal name is used as source identifiers for the firm's services. The firm's website, "www.randazza.com", incorporates the Complainant's surname (a copy of the home page of which appears in Annex AA to the Complaint).

In 2004, the Complainant's thesis garnered a measure of domestic notoriety resulting from its discussion of an issue during the 2004 US Presidential election. Further, the Complainant was asked to debate on Fox News, and has since been a frequent commentator on television and in print. The Complainant's blog, "The Legal Satyricon", upon which the Complainant publishes regularly under his byline, has had more than 2.5 million page views since 2006 with currently on the order of approximately 50,000 views per month.

In 2011 and as noted in an article provided in Annex EE to the Complaint, Xbiz World Magazine named the Complainant as one of the adult entertainment industry's Top 50 newsmakers and noted the Complainant's work on various high profile legal cases.

As evident in various articles appearing in Annex GG to the Complaint, the Complainant frequently appears as a legal commentator in several print media outlets including New York City Magazine, The New York Times, Boston Globe, and the Los Angeles Times. The Complainant also appears on national television and radio programs, including Fox News, CNN and National Public Radio. Furthermore, the Complainant has regularly spoken at various conferences across the US on panels concerning First Amendment and related intellectual property issues.

## C. The Respondents and their activities

Respondent Cox captions herself as an investigative blogger and search engine reputation manager, in addition to being a real estate agent.

Five months after Respondent Cox registered the disputed domain name <marcrandazza.com>, she registered seven more domain names related to the Complainant: five of which (also being the subject of the present dispute) incorporated the Complainant's name and a few of those also included a pejorative word, another one which contained the name of the Complainant's wife; and the last containing the name of the Complainant's three-year old daughter. These latter two domain names are not involved in the present proceeding. The WhoIs records for these other domain names respectively appear in Annexes D, E and F to the Complaint. Respondent Cox used these seven names to resolve to her websites containing numerous false blog news articles repeatedly containing the Complainant's name along with invective comments towards the Complainant and his wife. Within each such article, the Respondent included links to her other commercial websites. Respondent Cox's websites also included discussion of sexual activity. Respondent Cox, upon learning, through the media, that one of the seven additional domain names included the name of the Complainant's three-year old daughter, then re-directed that particular domain name to resolve to a blank page.

Once the Complainant informed Respondent Cox of this UDRP dispute, she transferred the registration of the disputed domain names listed in the original Complaint to Respondent Bernstein, who shortly thereafter transferred the domain name <marcrandazza.com> back to Respondent Cox. The remaining domain names are still registered to Respondent Bernstein, and the additional domain names are all registered to Respondent Cox. Respondent Bernstein acts on instructions provided by Respondent Cox and thus functions simply as a proxy for her. As such, for simplicity, all references hereinafter to Respondent Cox will simply be the "Respondent", unless specific reference is made to Respondent Bernstein.

After the Complainant initiated the present dispute, the Respondent registered numerous other domain names (also not subject of the present dispute), that included the Complainant's personal and business names, including <marcrandazzaparody.com>, <randazzalegalgroupsucks.com>, and <exposemarcrandazza.com> - the WhoIs records for these latter domain names appears in Annex PP to the Complaint. The Respondent also used these domain names to also resolve to her websites.

Currently, the disputed domain names resolve, on an intermittent basis, to the Respondent's websites that contain pay-per-click links to third-party websites and have advertisements keyed to the Complainant's line of business (as shown by hard-copy of the web pages in Annexes HH, II, and U to the Complaint), including to an attorney offering services competitive to those offered by the Complainant.

The Respondent then apparently configured her websites in a manner (so-called "Google bombing") that optimized their Google ranking, and hence elevated their position to locations near the top of a page of rank-ordered results of a Google search and hence enhanced their visibility and prominence to any Internet user who had just performed a Google search on the Complainant's personal name or the name of his law firm – a much higher position than would have otherwise occurred.

After the Complainant challenged her use of all the disputed domain names, the Respondent offered the Complainant her fee-based "reputation management" services through which the Respondent would "clean up" the Google search engine results regarding the Complainant and thereby improve the Complainant's on-line reputation, presumably by eliminating her commentary and ceasing further use of the disputed domain names. Her general conduct in that regard, though aimed against others than the Complainant, is discussed in various news articles, a copy of which appear in Annexes M, N, O, and P to the Complaint.

Specifically, as reported in "When Truth Survives Free Speech", The New York Times, Business Day - Media and Advertising, September 11, 2011 (a copy of this article appears in Annex M to the Complaint), the author states:

"... Ms. Cox, who calls herself an 'investigative blogger,' has a broad range of conspiratorial/journalistic interests. She has written that Bruce Sewell, the general counsel of Apple, 'aids and abets criminals; that Jeffrey Bewkes, the chief executive of Time Warner is a 'proven technology thief'; and that various Proskauer Rose lawyers have engaged in a pattern of 'conspiracy'. ...

Whenever she gets in a fight with someone, she frequently responds by creating a domain with the person's name, some allegation of corruption, or both. .. In order to optimize visibility to Web Crawlers, she often uses the full name and title of her target, and her Websites are filled with links to her other sites to improve their search ranking. She has some 500 URLs at her disposal and she's not afraid to use them.

... She is now offering 'PR services and Search Engine Management Services starting at $ 2500 a month' to promote 'Law Firms' ... and 'to protect online reputations and promote businesses'."

## 5. Parties' Contentions

### A. Complainant

(i) Identical or Confusingly Similar

The Complainant contends that each of the disputed domain names is identical to his personal name and confusingly similar to the name of his law firm because each such domain name either contains his personal name, in full or with his middle name either abbreviated as an initial or omitted, or his surname "Randazza" which also appears as a formative term, in his firm name. The Complainant asserts that through both his and his law firm's continuous and extensive use of the term "Randazza" since at least 2006 in conjunction with the services of providing commentary, publishing and rendering legal services, he has acquired common law trademark rights in his personal name, including his surname, which provide him with the rights of trademark exclusivity necessary to invoke paragraph 4(a)(i) of the Policy.

Hence, the Complainant believes that it has satisfied the confusing similarity/identity requirement in paragraph 4(a)(i) of the Policy.

(ii) Rights or Legitimate Interests

The Complainant contends that, for various reasons, the Respondent has no rights or legitimate interests in any of the disputed domain names pursuant to paragraph 4(a)(ii) of the Policy.

First, as the Complainant asserts that the Respondent has no such rights or legitimate interests in each of the disputed domain names, the burden shifts to the Respondent to provide sufficient evidence of her rights or legitimate interests in each disputed domain name. Since her registration and use of each of the disputed domain names is in bad faith, she is unable, based on that conduct, to establish any rights or legitimate interests in any of those disputed domain names.

Exh. 18.1-2

Second, the Respondent has notice that each of these disputed domain names is confusingly similar to the Complainant's marks when she registered that domain name, thus precluding any rights or legitimate interests she might otherwise have in all the disputed domain names.

Third, the Respondent has not used any of the disputed domain names for a *bona fide* purpose. In that regard, the Respondent used the domain name <marcrandazza.com> to resolve to a pay-per-click site and only having added, as a pretext, content to that site after the Complainant challenged her motives regarding the disputed domain names as well as the other domain names containing the names of the Complainant's wife and daughter. After the Complainant confronted the Respondent about her use of the domain name <marcrandazza.com>, the Respondent registered the rest of the disputed domain names and established pre-textual "investigative" websites concerning the Complainant. However, these sites were rife with advertisements keyed to and in some instances competitive with the Complainant's business. This use was designed to camouflage the Respondent's illicit use of the disputed domain names as a vehicle through which she would profit through advertising revenue and also interfere with the Complainant's business. After her pretextual use commenced, the Respondent registered domain names containing the names of the Complainant's family members as part of her scheme. Such use does not yield any rights or legitimate interests in any of the disputed domain names.

Fourth, the Respondent is not known by any of the disputed domain names, as each is solely the name of the Complainant. As such, the use of each of the disputed domain names causes "initial interest confusion" of Internet users by directing each user, who seeks the Complainant's website, to one of the Respondent's websites instead. Consequently, that use does not qualify as legitimate parody, criticism or fair use. In that regard, the Respondent has previously registered domain names that solely include her target's full names and uses link-bombing methods in an effort to increase the prominence of her search results on search engines. The Respondent then offers to provide "reputation management" services to her target in return for a fee. Such websites are not "criticism sites" but merely a pretext for the Respondent's bad faith extortionate use.

(iii) Registered and Used in Bad Faith

The Complainant contends that, for any of several reasons, the Respondent has registered and is using each of the disputed domain names in bad faith pursuant to paragraph 4(a)(iii) of the Policy.

First, the Respondent registered all the domain names to: (a) prevent the Complainant from using his personal name in a domain name and specifically admitted having done so for that reason, (b) profit from the Complainant's personal name, (c) harass the Complainant and his family, and (d) show other potential victims what happens when they do not succumb to her extortionate demands. Here, the Respondent used the disputed domain names, which contained the Complainant's personal name, in an attempt to: (a) "Google bomb" the Complainant through which she ensured that her websites, containing false statements about the Complainant, would appear near the top of a page of Google search results that occurred in response to an Internet user having performed a Google search on the Complainant's personal name or the name of his law firm; and (b) generate click-through revenue through paid-per-click links, to third-party websites, appearing on her sites. One of those links was associated with a third-party Las Vegas attorney who competed with the Complainant, thus affording the Respondent an opportunity to financially exploit the Complainant's reputation for her own benefit.

Exhibit 2

Second, the Respondent, by virtue of having registered multiple domain names that each contained the Complainant's personal name, intended to disrupt and interfere with the Complainant's business.

Third, the Respondent attempted to commercially benefit from registration of these names by offering "reputation management" services to the Complainant – through baiting the Complainant into an extortionate scheme. Specifically, once the Complainant declined her "reputation management" services, the Respondent then registered domain names that contained not only the Complainant's surname, but also the personal names of his wife and three year old daughter, and then included falsehoods about the Complainant on her websites to which the domain names resolved. The Respondent would then eliminate such sites, and hence the ensuing injury to the Complainant's reputation, only if the Complainant would purchase her "reputation management" services. Further, the Respondent repeatedly engaged in the same general type of extortionate conduct by offering her "reputation management" services to others, including as her targets various business people and third-party attorneys, thus reflecting a pattern of such conduct.

Fourth, Respondent Cox exhibited bad faith in transferring ownership of some of the disputed domain names to Respondent Bernstein, who merely served as a proxy of the former, in an attempt to evade liability (via so-called "cyberflight") under the Policy.

## B. Respondent

In what appears to be her explanation contained in an e-mail message dated September 27, 2012 from the Respondent to the Center (and among the multitude of documents that the Respondent filed in response to the amended Complaint and all of which the Panel views as the Supplemental Response), the Respondent states that she is dedicated to protecting her future clients and registered all the disputed domain names with that purpose in mind, to "preach the Truth about Marc Randazza, and to make fun of Marc Randazza's lack of knowledge of the Domain Name as he brags so strong to be an expert in, yet did not buy these domains himself".

She further stated in her explanation:

"…Marc Randazza's attorney and big media friends harass, threaten me over buying a domain name. I bought MarcRandazza.info, MarcRandazza.biz, MarcRandazza.mobi, to fight back and tell my side.

I never received ad revenue on MarcRandazza.info, MarcRandazza.biz, MarcRandazza.mobi. If Godaddy has that is nothing to do with me. …".

## 6. Discussion and Findings

### A. Identical or Confusingly Similar

Inasmuch as each of the Complainant's RANDAZZA Marks is unregistered, the Complainant predicates his case on his having acquired common law trademark rights by virtue of having continuously and widely used his marks in commerce and specifically, through himself and his law firm, in connection with providing commentary, publishing and rendering legal services.

In the United States, unregistered (common law) marks, once they have acquired sufficient distinctiveness through use in their associated product or service and geographic markets, can convey requisite exclusivity and there through legally enforceable trademark rights to their owners. It is now widely recognized that

inasmuch as the Policy does not limit paragraph 4(a)(i) to just registered marks, trademark rights predicated on such common law marks will qualify. See, e.g., *WHM L.L.C. v. Northpoint, Inc.*, WIPO Case No. D2005-1134. Specifically, the panel in *Brooklyn Institute of Arts and Sciences v. Fantastic Sites, Inc.*, NAF Claim No. 95560 held: "ICANN dispute resolution policy is broad in scope in that the reference to a trademark or service mark in which the complainant has rights means that ownership of a registered mark is not required, unregistered or common law trademark or service mark rights will suffice to support a domain name complaint under the policy". See, e.g., *True Blue Productions, Inc. v. Chris Hoffman*, WIPO Case No. D2004-0930; *AT&T Corp. v. Roman Abreu d/b/a Smartalk Wireless*, WIPO Case No. D2002-0605; *Peter Frampton v. Frampton Enterprises, Inc.*, WIPO Case No. D2002-0141; *America Online, Inc. v. John Deep d/b/a Buddy USA Inc.*, NAF Claim No. 96795; *Missing Children Minnesota v. Run Yell Tell, Ltd.*, NAF Claim No. 95825; *Mike Warner 2001 v. Mike Larson*, NAF Claim No. 95746; *CMG Worldwide, Inc. v. Naughtya Page*, NAF Claim No. 95641; *Home Properties v. SMSOnline*, NAF Claim No. 95639; *Bridal Rings Company v. Albert Yemenian/Albert Yemenian*, NAF Claim No. 95608 and *United States Postal Service v. Consumer Information Organization*, NAF Claim No. 95757.

Therefore, given that common law trademark rights suffice under the Policy, then, as a threshold matter, the analysis begins by assessing whether common law trademark rights actually existed in the RANDAZZA Marks as of, at least for simplicity, the earliest date on which the Respondent registered any of the disputed domain names. If the rights predate the earliest registration date, then the dates of any later registrations need not be considered.

The Respondent did not dispute any of the Complainant's activities in having used those marks since at least 2006 as extensively, continuously and in the manner he did in conjunction with providing commentary, publishing and rendering legal services. This date well predates December 10, 2011 on which the Respondent registered the first one of the disputed domain names, specifically <marcrandazza.com>.

The Respondent's seeming reliance on the *Joseph Leccese v. Crystal Cox*, WIPO Case No. D2011-0679 and *Allen Fagin v. Crystal Cox*, WIPO Case No. D2011-0678 cases, to challenge the Complainant's trademark rights in the formative term "Randazza" in the disputed domain names and thus disqualify the Complainant under paragraph 4(a)(i) of the Policy, is unavailing. The facts in both of these cases are markedly distinguishable from those of the present dispute. Specifically, in both cases, the complainants asserted that each had acquired common law trademark rights in his personal name, Joseph Leccese and Allen Fagin, such that the Policy would apply to the disputed domain names respectively <josephleccese.com> and <allenfagin.com>, also registered by the Respondent here, which contained the corresponding personal name. However, in each instance, the panel concluded that each complainant had no such rights in his own personal name for the simple reason that each furnished services (there being legal services), not under his own personal name, but rather solely under a totally different firm name, Proskauer Rose, which did not include his personal name. As such, each complainant was unable to show that his personal name had acquired any distinctiveness by itself as a source identifier and hence any common law trademark significance, thus negating the applicability of paragraph 4(a)(i). In the present dispute, the Complainant renders services under both his own personal name including his surname Randazza and the name of his law firm, Randazza Legal Group, specifically including, as its formative element, his surname. Hence, due to commonality of the surname in both instances, the Complainant has established that he acquired common law trademark rights not only in his own personal name but also in the name of his law firm.

Given these findings, the analysis now focuses on whether each of the disputed domain names is either identical or confusingly similar to the Complainant's RANDAZZA Marks.

From a simple comparison of the each of the disputed domain names to the Complainant's marks RANDAZZA, MARC RANDAZZA, MARC J. RANDAZZA and MARC JOHN RANDAZZA, no doubt exists that each of the disputed domain names is identical to a corresponding one of the Complainant's RANDAZZA Marks.

In particular, four of the disputed domain names contain "marcrandazza" as the second level domain with the only difference between these names being that each name has a different appended generic Top-Level Domain (gTLD), here .com, .biz, .info, and .mobi. Each of the other two disputed domain names contains either "marcjrandazza" and "marcjohnrandazza" as its corresponding second level domain, with a common appended gTLD of .com. In each of these six instances, the gTLD suffix is irrelevant in assessing confusing similarity or identity under paragraph 4(a)(i) of the Policy and thus ignored. See, *e.g.*, *Kayak Software Corporation v. KAYAK.travel, KAYAK.travel Corporation, Kayak Las Vegas, LLC*, WIPO Case No. D2011-0425 and *Photo Tour Books, Inc. d/b/a PhotoSecrets v. Beate Chelette*, WIPO Case No. D2010-1373.

Hence, the Complainant has satisfied his burden under paragraph 4(a)(i) of the Policy.

**B. Rights or Legitimate Interests**

Based on the evidence of record here, the Panel finds that no basis exists which would appear to legitimize a claim by the Respondent to any of the disputed domain names under paragraph 4(c) of the Policy.

The Complainant has never authorized the Respondent to utilize any of the RANDAZZA Marks nor does the Complainant apparently have any relationship or association whatsoever with the Respondent. As such, any use to which the Respondent were to put any of the Complainant's RANDAZZA Marks or one confusingly similar thereto in connection with the identical or even similar services to those currently provided by the Complainant, in circumstances as are present here, may violate the exclusive trademark rights now residing with the Complainant. See, *e.g., National Westminster Bank plc v. Steve Mart*, WIPO Case No. D2012-1711; *Amy Stran v. EzDomainSearch.com, Juan Curtis*, WIPO Case No. D2011-1710; *Tommy Bahama Group, Inc. v. Berno Group International*, WIPO Case No. D2012-0531; *Space Needle LLC v. Erik Olson*, WIPO Case No. D2011-0931; *Oakley, Inc. v. Kate Elsberry, Elsberry Castro*, WIPO Case No. D2009-1286; *Burberry Limited v. Domain Admin*, WIPO Case No. D2009-0703; *HRB Innovations Inc., Express Tax Service Inc. v. Calvin Brown*, WIPO Case No. D2008-1072; *Dreamworks Animation, LLC v. Creahq, Mike Furlong*, WIPO Case No. D2008-0505; *MySpace, Inc. v. Edwin De Jesus, EDJ Associates Inc.*, WIPO Case No. D2007-1878; *BlackRock, Inc. v. blackrockfinancialservices.com*, WIPO Case No. D2007-1627; *F. Hoffmann-La Roche AG v. Transliner Consultants*, WIPO Case No. D2007-1359; *National Football League v. Peter Blucher d/b/a BluTech Tickets*, WIPO Case No. D2007-1064; *Toilets.com, Inc. v. Rons Porta Johns*, WIPO Case No. D2007-0952; and *Associated Bank Corp. v. Texas International Property Associates*, WIPO Case No. D2007-0334. Also, see *Starline Publications, Inc. v. Unity*, WIPO Case No. D2008-1823; *GoDaddy.com, Inc., v. GoDaddysDomain.com, Clark Signs, Graham Clark*, WIPO Case No. D2007-0303; *Citgo Petroleum Corporation v. Richard Antinore*, WIPO Case No. D2006-1576; *New Destiny Internet Group, LLC and Xplor Media, Inc. v. SouthNetworks*, WIPO Case No. D2005-0884; *Pelmorex Communications Inc. v. weathernetwork*, WIPO Case No. D2004-0898; *Sybase, Inc. v. Analytical Systems*, WIPO Case No. D2004-0360; *Caesars World, Inc. and Park Place Entertainment Corporation v. Japan Nippon*, WIPO Case No. D2003-0615; *Leiner Health Services Corp. v. ESJ*

*Nutritional Products*, NAF Claim No. 173362; *MPL Communications, Limited et al v. 1WebAddress.com*, NAF Claim No. 97092; *Treeforms, Inc. v. Cayne Industrial Sales, Corp.*, NAF Claim No. 95856; and *America Online, Inc. v. Xianfeng Fu*, WIPO Case No. D2000-1374. Consequently, in this Panel's view, the Respondent could not legitimately acquire any public association between herself and any of the RANDAZZA Marks or even any mark similar thereto, at least for the services provided by the Complainant under his marks.

Further, there is absolutely no evidence of record that the Respondent has ever been commonly known by the disputed domain names or more generally any of the RANDAZZA Marks. Nor could the Respondent likely ever become commonly known by any of the disputed domain names or any of the RANDAZZA Marks without infringing on the exclusive trademark rights of the Complainant. This is so in light of the Complainant's exclusive trademark rights, having arisen under common law, which date back at least five years prior to the earliest date (December 10, 2011) when the Respondent first registered any of the disputed domain names, and the widespread reputation and notoriety which the Complainant has gained in his RANDAZZA Marks ever since – which the Respondent does not contest. *See, e.g., National Westminster Bank, Tommy Bahama, Amy Stran, Space Needle, Oakley, Burberry, Starline Publications, HRB Innovations Inc., MySpace* and *Treeforms, Inc.*, all cited *supra*.

Hence, based on the evidence before the Panel, the Respondent does not fall within paragraph 4(c)(ii) of the Policy. Moreover, the facts of record do not indicate that the Respondent's actions qualify under either paragraph 4(c)(i) or 4(c)(iii) of the Policy.

Furthermore, the Respondent's actions in registering and using the disputed domain names may appear, at a first glance, to simply be a vehicle through which she provides advertising through pay-per-click sites, but on slightly closer examination are actually components of an artifice intended to extort funds from the Complainant and thus a pretext for a rather egregious variant of cybersquatting. As such, none of those actions can or will serve as a predicate upon which the Respondent can lawfully develop any rights or legitimate interests in any of the disputed domain names.

Accordingly, the Panel concludes that the Respondent has no rights or legitimate interests in any of the disputed domain names within paragraph 4(a)(ii) of the Policy.

## C. Registered and Used in Bad Faith

The Panel finds that the Respondent's actions, with respect to each of the disputed domain names, constitute bad faith registration and use for purposes of the Policy.

The Panel infers from the Respondent's explanation that she may be claiming that her websites provide commentary critical of the Complainant and thus forms protected speech under the First Amendment to the US Constitution which may serve to legitimize her use of the disputed domain names. However, the Respondent registered a multiplicity of other domain names that each contains the Complainant's surname coupled with a pejorative term and has not provided any evidence whatsoever, let alone persuasive, as to why any of those other domain names (none of which is in dispute here) would not provide a sufficient substitute vehicle for a website to voice her commentary. Hence, the Panel flatly rejects any claim, which the Respondent may inferentially be making that her speech and hence her use of the disputed domain names somehow enjoys Constitutional protection, as utterly misguided. *See, e.g., 322 West 57th Owner LLC v. Administrator, Domain*, WIPO Case No. D2008-0736 where the this Panel stated: "It is now rather well

established in UDRP precedent that, at least in cases involving parties based in the US, a respondent's site that solely provides criticism, regardless of the severity or directness of that criticism, is protected under the First Amendment to the US Constitution as being an exercise of that respondent's right of free speech. However, such protection is not absolute. If the respondent engages in actions that evince bad faith, and particularly conduct that commercially exploits the name for the respondent's pecuniary benefit, thus indicating that the respondent's intentions were not aimed solely at providing critical comment, then any such protection which would otherwise arise is lost." Such is clearly the case here. The lack of any such Constitutional protection for the Respondent under the present facts is not surprising inasmuch as her conduct clearly evidences bad faith.

In any event, for purposes of the Policy the Panel finds the Respondent's intention, as reflected by the record, was never to solely provide, through her websites, speech critical of the Complainant. Rather, her objective in both registering and using the disputed names was apparently to engage in a rather sinister and tenacious scheme to extort money from the Complainant. Specifically, the Respondent first posted negative and false commentary on her websites that was intentionally calculated to injure the Complainant's on-line reputation and disrupt the Complainant's business conducted through his law firm. Thereafter, the Respondent used those sites in a manner that apparently optimized their ranking on the Google search engine in order to increase their visibility and prominence on search results yielded through a Google search of the Complainant, thus likely exacerbating the injury caused to the Complainant. Once all this occurred, the Respondent then offered her reputational management services to the Complainant through which, for a considerable fee, she would remediate the Complainant's on-line reputation by eliminating all the negative and false commentary of her own making and presumably also ceasing her use of the disputed domain names. Basically, for a price, she would undo the injury to the Complainant for which she was responsible for having created in the first place. This egregious conduct clearly constitutes bad faith under the Policy.

Further, the Respondent, in registering multiple domain names which each incorporated the Complainant's personal name or surname – all of which are identical to corresponding ones of the Complainant's RANDAZZA Marks, certainly denied the Complainant the right to reflect any of those marks in a domain name and exhibited a pattern of conduct in doing so.

Lastly, the Respondent's websites, to which the disputed domain names resolved, contained pay-per-click (click-through) links to third-party websites, including that of a competitor of the Complainant. Obviously, in doing so, the Respondent relied on the confusion she caused to Internet users who thought they were reaching the Complainant's website but in actuality were diverted to one of the Respondent's websites instead for her own pecuniary benefit in subsequently collecting click-through revenue as a result of some of those users interacting with those sites – revenue she would not have gained but for the diversion, and denying the Complainant legal business and his resulting revenue which he and his law firm may have otherwise received had those users not been so diverted.

Hence, the Panel concludes that the Respondent violated paragraph 4(a)(iii) of the Policy including both the general bad faith provision in paragraph 4(b) and also the specific exemplary bad faith conduct set forth in each of paragraphs 4(b)(ii), (iii) and (iv) thereof.

Thus, the Panel concludes that the Complainant has provided sufficient proof of his allegations, with respect to each of the disputed domain names, to establish a case under paragraph 4(a) of the Policy upon which the relief he now seeks can be granted.

## 7. Decision

Accordingly, under paragraphs 4(i) of the Policy and 15 of the Rules, the Panel grants the relief sought by the Complainant. The disputed domain names <marcjohnrandazza.com>, <marcjrandazza.com>, <marcrandazza.com>, <marcrandazza.biz>, <marcrandazza.info> and <marcrandazza.mobi> are all ordered to be transferred to the Complainant.

Peter L. Michaelson
Sole Panelist
Dated: November 30, 2012

## COMPLAINT TRANSMITTAL COVERSHEET

Attached is a Complaint that has been filed against you with the World Intellectual Property Organization (**WIPO**) Arbitration and Mediation Center (the **Center**) pursuant to the Uniform Domain Name Dispute Resolution Policy (the **Policy**) approved by the Internet Corporation for Assigned Names and Numbers (**ICANN**) on October 24, 1999, the Rules for Uniform Domain Name Dispute Resolution Policy (the **Rules**) approved by ICANN on October 30, 2009, and the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy (the **Supplemental Rules**).

The Policy is incorporated by reference into your Registration Agreement with the Registrar(s) of your domain name(s), in accordance with which you are required to submit to a mandatory administrative proceeding in the event that a third party (a **Complainant**) submits a complaint to a dispute resolution service provider, such as the Center, concerning a domain name that you have registered. You will find the name and contact details of the Complainant, as well as the domain name(s) that is/are the subject of the Complaint in the document that accompanies this Coversheet.

You have no duty to submit a Response to the Complaint until you have been formally Notified of the Complaint and Commencement of Administrative Proceedings by the Center. Once the Center has checked the Complaint to determine that it satisfies the formal requirements of the Policy, the Rules and the Supplemental Rules, it will forward an official copy of the Complaint, including annexes, to you by e-mail as well as sending you hardcopy Written Notice by post and/or facsimile, as the case may be. You will then have 20 calendar days from the date of Commencement within which to submit a Response to the Complaint in accordance with the Rules and Supplemental Rules to the Center and the Complainant. You may represent yourself or seek the assistance of legal counsel to represent you in the administrative proceeding.

- The **Policy** can be found at http://www.icann.org/en/dndr/udrp/policy.htm

- The **Rules** can be found at http://www.icann.org/en/dndr/udrp/uniform-rules.htm

- The **Supplemental Rules**, as well as other information concerning the resolution of domain name disputes can be found at http://www.wipo.int/amc/en/domains/supplemental/eudrp/

- A **model Response** can be found at http://www.wipo.int/amc/en/domains/respondent/index.html

Alternatively, you may contact the Center to obtain any of the above documents. The Center can be contacted in Geneva, Switzerland by telephone at +41 22 338 8247, by fax at +41 22 740 3700 or by e-mail at domain.disputes@wipo.int.

You are kindly requested to contact the Center to provide an alternate e-mail address to which you would like (a) the Complaint, including Annexes and (b) other communications in the administrative proceeding to be sent.

WIPO          Exhibit 2a

A copy of this Complaint has also been sent to the Registrar(s) with which the domain name(s) that is/are the subject of the Complaint is/are registered.

By submitting this Complaint to the Center the Complainant hereby agrees to abide and be bound by the provisions of the Policy, Rules and Supplemental Rules.

Exhibit 2A

*Before the:*

## WORLD INTELLECTUAL PROPERTY ORGANIZATION
## ARBITRATION AND MEDIATION CENTER

Marc John Randazza,
Marc J. Randazza, PA,
6525 W. Warm Springs Road
Suite Number 100
Las Vegas, Nevada 89118
USA
**(Complainant)**

-v-

Crystal Cox & Eliot Bernstein (proxy)
P.O. Box 1610
Eureka, Montana 59917
USA

**(Respondent)**

**Disputed Domain Name(s):**

<marcrandazza.com>
<marcjrandazza.com>
<marcjohnrandazza.com>

## COMPLAINT
(Rules, Paragraph 3(b);  Supplemental Rules, Paragraphs 4(a), 12(a), Annex E)

### I.  Introduction

[1.]    This Complaint is hereby submitted for decision in accordance with the Uniform
Domain Name Dispute Resolution Policy (the **Policy**), approved by the Internet
Corporation for Assigned Names and Numbers (**ICANN**) on October 24, 1999, the
Rules for Uniform Domain Name Dispute Resolution Policy (the **Rules**), approved by
ICANN on October 30, 2009, and the WIPO Supplemental Rules for Uniform
Domain Name Dispute Resolution Policy (the **Supplemental Rules**).

### II.  The Parties

### A.  The Complainant
(Rules, Paragraphs 3(b)(ii) and (iii))

3

*Exhibit 2a*

[2.]   The Complainant in this administrative proceeding is Marc J. Randazza, owner of
Marc J. Randazza PA.

[3.]   The Complainant's contact details are:

|            |                                      |
|------------|--------------------------------------|
| Address:   | Marc J. Randazza                     |
|            | c/o Randazza Legal Group             |
|            | 6525 W. Warm Springs Road, Suite 100 |
|            | Las Vegas, NV 89118                  |
| Telephone: | (888) 667-1113                       |
| Fax:       | (305) 437-7662                       |
| E-mail:    | ecf@randazza.com                     |

[4.]   The Complainant's authorized representative in this administrative proceeding is:

Ronald D. Green, Esq.
Randazza Legal Group
6525 W. Warm Springs Blvd., Suite 100
Las Vegas, NV 89118
Phone: (888) 667-1113
Fax: (305) 437-7662
RDG@randazza.com

[5.]   The Complainant's preferred method of communications directed to the Complainant
in this administrative proceeding is:

Electronic-only material
Method:     e-mail
Address:    RDG@randazza.com, rlgall@randazza.com
Contact:    Ronald D. Green

Material including hardcopy (where applicable)
Method:     Fax
Fax:        305-437-7662
Contact:    Marc J. Randazza

**B.   The Respondent**
(Rules, Paragraph 3(b)(v))

*Exhibit 2 A*

[6.]   According to the Whois Database, the Respondent in this administrative proceeding is Crystal Cox of Eureka, Montana and proxy Eliot Bernstein.  Copies of the printout of the database search conducted on June 15, 2012 are provided as Annex A.

[7.]   All information known to the Complainant regarding how to contact the Respondent is as follows:

Name:          Reverend Crystal Cox
Address:       PO Box 1610
               Eureka, Montana 59917
               USA
Tel No    +1-4062704046
Fax No         N/A
Email          savvybroker@yahoo.com
Legal Status   Individual

Two of the domains are registered in another party's name, which is below. However, this is a proxy registration and Cox is the beneficial owner of the domains and continues to operate them.

Name:          Eliot Bernstein
Address:       2753 N.W. 34th St.
               Boca Raton, FL 33434-3459
               USA
Tel No.        +1.5612458588
Fax no.        N/A
Email          iviewit@iviewit.tv
Legal Status   Individual

**Treatment of the beneficial holder of the domain name, Cox, and the proxy registrant, Eliot Bernstein as Respondent is proper.**

In situations where a proxy registrant (Bernstein), is listed on the WhoIs record rather than the beneficial holder of the domain name (Cox), panels treat both as Respondent. *"In a number of recent Panel decisions where ambiguity as to the identity of the proper respondent has arisen due to the use by the beneficial holder of the domain name of an identity shield in the form of a proxy registrant, the practice of the Center has been to treat both the proxy registrant and the beneficial holder as Respondent." Osan Limited v. Socks Depot Corporation and Lorne R. Lieberman,* WIPO Case No. D2007-0215. See also *WWF-World Wide Fund for Nature aka WWF International v. Moniker Online Services LLC and Gregory Ricks,* WIPO Case No. D2006-0975, (outlining strategy panels use for proxy domain registrants).

5

*Exhibit 2a*

The present situation is more akin to *Osan Limited* than *WWF-World Wide Fund* in that Cox is not using a proxy service, but instead registered the domains using acquaintances. The panel need only examine the websites to see that the content and creation is all by Cox.(Annexes G, H, and I.) Each site identifies the respondent as the author of the site. All of the websites have the same purpose, feature a similar layout and style, and have the same postings.

Prior to March 2012, all were registered to Crystal Cox. (Annex L). When Cox realized that she could face a dispute, she transferred them. However, the content and postings remained the same and continued to be authored by Cox.

### III.  **The Domain Name(s) and Registrar(s)**
(Rules, Paragraphs 3(b)(vi), (vii))

[8.]    This dispute concerns the domain name(s) identified below:

<marcrandazza.com>; <marcjrandazza.com>; <marcjohnrandazza.com>

[9.]    The registrar(s) with which the domain name(s) is/are registered is/are:

GoDaddy.com, Inc.
14455 N. Hayden Road, Suite 219
Scottsdale, Arizona 85260; USA
Email: domaindisputes@godaddy.com
Tel.: +1 (480) 505-8899

### IV.  **Language of Proceedings**
(Rules, Paragraph 11)

[10.]   To the best of the Complainant's knowledge, the language of the Registration Agreement is English, a copy of which is provided as Annex B to this Complaint. The Complaint has been submitted in English. The Complainant requests that the language of proceedings be English and provides the Registration Agreement as evidence.

### V.  **Jurisdictional Basis for the Administrative Proceeding**

(Rules, Paragraphs 3(a), 3(b)(xv))

[11.]   This dispute is properly within the scope of the Policy and the Administrative Panel
has jurisdiction to decide the dispute.  The registration agreement, pursuant to which
the domain name that is the subject of this Complaint is registered, incorporates the
Policy. A true and correct copy of the domain name dispute policy that applies to the
domain name in question is provided as Annex C to this Complaint and can be found
at < http://archive.icann.org/en/udrp/udrp-policy-24oct99.htm>.

### VI.  Factual and Legal Grounds
(Policy, Paragraphs 4(a), (b), (c);  Rules, Paragraph 3)

#### A. Summary of Facts

[13.]   On  December  10,  2011,  Crystal  L.  Cox  registered  the  domain  name
<marcrandazza.com> (the "Disputed Domain Name") − not because that name
referred to her, or because she intended any *bona fide* offering of goods or services
using the Disputed Domain Name, but instead for the purpose of furthering a bad faith
plan to profit through the use of pay-per-click advertising and through an extortion
scheme, which is Cox's well-documented *modus operandi*.

[14.]   In five months, Respondent registered 7 more domains affiliated with Complainant −
5 incorporating Complainant's name (Annex D), 1 containing the Complainant's
wife's name (Annex E), and 1 containing the name of Complainant's 3-year-old
daughter (Annex F) − and directed each domain to a contrived website where
Complainant's name appears repeatedly in made-up "news" articles containing barely
literate and paranoid rants. (*e.g.,* Annexes G, H, I, J, K).  Respondent then peppered
each blog article with hyperlinks to her other commercial websites, attempting to
manipulate the page ranking of Respondent's sites when indexed by search engines in
order to interfere with the Complainant's legitimate blogging endeavors and law
practice and to gain money for herself.

[15.]   Upon being made aware of the disputed status of the domain names, Respondent
engaged in a scheme to continuously "cyberfly" the domain names from one
registrant to another in an attempt to evade a UDRP.  Cox transferred the domain

names in question to other parties—including her proxy Eliot Bernstein after realizing she would face action regarding her registration and use of the domains. (Annex L). Cox has since transferred <marcrandazza.com> back to her name, while the others have been transferred to Bernstein. (Annex A).

[16.]   The domains originally were used as pay-per-click sites, but her post-hoc use was to misdirect anyone searching for Complainant to Respondent's websites.   After Complainant challenged these illegitimate uses of the domain names, Respondent offered Complainant fee-based "reputation management" services – purportedly to "clean up" Complainant's search engine results.   Given that Respondent is the source of the negative content appearing in search results, Respondent's offer to improve Complainant's reputation is illusory at best.   Respondent's offer amounted to extortion – requiring Complainant to pay fees to halt Respondent's negative content. (Annex M, N, O, and P.)

[17.]   While Respondent's actions are not a common form of cybersquatting, her registration and use of the domains for pay-per-click, extortion, and generation of advertising revenue keyed to Complainant's name is bad faith under the UDRP.   The domains should be transferred to Complainant.

**B. Argument**

**II. The Disputed Domain Name is identical to Complainant's personal name and is confusingly similar to the name of his law firm.**

[18.]   Under Para. 4(a)(i), Complainant is required to show that the domain is identical to – or confusingly similar to – a mark in which Complainant has rights.

[19.]   The Policy protects personal names when, as here, they obtain the status of marks in which complainant has rights. *Kotak Mahindra Bank Limited v. Richard Brown,* Case No. D2008-0243. *"It is well established that the Policy can protect a Complainant's unregistered rights in his or her personal name as a mark where the name is recognized as identifying the origin of goods or services in relation to which is used."*

*Id.*  Where a businessman's personal name is used as a company name, where that businessman is the driving force behind the company, and where the businessman's achievements are linked with that company, that personal name is protectable as a trademark. *Id.* That enterprise "has a clear interest in protecting his name for commercial use." *Id.* Thus, when an individual's surname is tied closely to a company name, a domain containing the businessman's full personal name is protected. *Id.* In some personal name decisions, not relevant here, the attorney complainant has been unsuccessful when they have not been doing business under their names, but a generic firm name.

[20.]  Randazza's firm, Randazza Legal Group, is known throughout the United States and around the world for its work.  In 2008, Randazza Legal Group incorporated as Marc J. Randazza PA ("MJRPA").  Since 2008, MJRPA has done business using Randazza Legal Group and Marc Randazza's personal name as source identifiers for its services.  (Annex Q.)    The firm's website, <randazza.com>, incorporates Complainant's surname.(Annex AA.)

[21.]  In 2004, Complainant Randazza's thesis garnered national notoriety, as it dealt with an issue during the 2004 U.S. Presidential election. (Annex BB, Page 5.)  Following the publication, Randazza was asked to debate on Fox News, and has since been a frequent legal commentator on television and in print. (Annex BB.)  Complainant's blog, The Legal Satyricon, upon which Marc J. Randazza publishes regularly under his byline, is one of the most well-known law blogs in the world.  Since launching in 2006, Randazza's blog has had more than 2.5 million page views, and receives about 50,000 views per month.  (Annex CC and DD).  Accordingly, for at least three years prior to the foundation of the Randazza Legal Group, Randazza's name functioned as a common law trademark for his commentary and publishing.

[22.]  As a result of notoriety in the legal field, Randazza was hired as a professor of law at Barry University and lectured there from 2006 to 2009, teaching First Amendment, copyright, trademark, and entertainment law.  See Annex BB.

[23.]   In 2011, XBiz World Magazine, the adult entertainment industry's business publication, named Randazza one of the adult entertainment industry's Top 50 newsmakers.  XBiz lauded Randazza's work on high profile cases. (Annex EE.)

[24.]   A Google® search for his name reveals that Complainant is widely known, and that his name functions as a trademark for legal services and legal writing. (Annex FF). He is frequently sought out by the media as a legal commentator. (Annex BB.)  Randazza appears in New York City Magazine, New York Times, Boston Globe, Los Angeles Times, Fox News, and CNN, among others. (Annex GG.)  Complainant authored front-page commentary for CNN.com. *Id.*  Complainant appears on national television and radio programs, including Fox News and National Public Radio. (Annex BB, 4-5.) Complainant regularly speaks on panels about the First Amendment and intellectual property at conferences across the country.  Recently, he spoke at a conference for alternative newspapers, gave a lecture on Anti-SLAPP suits to the First Amendment Lawyers' Association, lectured on a panel about legal issues in adult entertainment for the CineKink film festival, was a featured speaker at the American Intellectual Property Law Association (AIPLA) in Austin, Texas, etc.  (Annex BB, 10-11.)  The media regularly turn to Randazza for commentary on First Amendment and intellectual property issues.  (Annex BB, 4-10, Annex GG.)

[25.]   Randazza's firm and name are distinctive for offering First Amendment and intellectual property litigation and legal analysis in the international legal community and beyond, and functioned as a common law trademark since at least 2006.  Complainant meets the standard in *Kotak* in that his surname and company name are recognized in relation to the services he provides: litigation, legal analysis, and legal commentary.  Therefore, Complainant's name has achieved the status of a protectable, common law mark under UDRP standards.

[26.]   Respondent is expected to compare this dispute to that of other domains she acquired containing attorney names.  However, these cases are irrelevant, as complainants in those cases failed to show that their personal names were distinctive.  Rather, the WIPO Panel held that those complainants offered their legal services under the name of their law firm—Proskauer Rose—and not under their personal names. Complainant

Randazza's firm consists of his personal name and has been in use as a trademark for at least six (6) years.

**III. Respondent has neither rights or legitimate interests in respect of the Disputed Domain Name**

[27.]   Registration and use of a domain name in bad faith establishes neither rights nor legitimate interests. *N.C.P. Marketing Group, Inc. v. Entredomains,* WIPO Case No. D2000-0387.  Once Complainant asserts that Respondent has no rights or legitimate interests with respect to a domain, the burden then shifts to Respondent to provide "concrete evidence that it has rights to, or legitimate interest in the domain name at issue." *Do the Hustle, LLC v. TropicWeb,* WIPO Case No. D2000-0624.

[28.]   Respondent cannot claim to have rights or legitimate interests in a domain name where Respondent has notice that a domain is confusingly similar to Complainant's mark or where Respondent registered or used the domain name in bad faith. "*One who has constructive knowledge of the trademark, and who contacts the trademark owner and advises the owner that he has acquired a confusingly similar domain name which he intends to use in competition with the trademark owner, has no rights or legitimate interests in the domain name.*" *Marconi Data Systems, Inc. v. IRG Coins and Inc Source, Inc.*, WIPO Case No. D2000-0090.

[29.]   Respondent will not be able to provide evidence that she has rights or a legitimate interest in the domains.  She has not used the domains for a *bona fide* purpose. Respondent initially used the site <marcrandazza.com> as a pay-per-click site – only engaging in the pretext of adding content to it after Complainant challenged her motives for registering it, as well as other domain names containing Complainant's name and the names of his wife and young daughter. (Annex S and T.)  It is well-established that pay-per-click sites and domain parking pages are not *bona fide* offerings of goods or services. *Air Deccan v. Premium Domain,* WIPO Case No. D2005-0895; *Societe Air France v. Bing G. Glu,* WIPO Case No. D2006-0834.  Even if they were, creating a PPC website for the sole purpose and function of profiting off of someone else's name is not good faith.

*Exh. Bit 2a*

[30.] After Complainant confronted Respondent about the <marcrandazza.com> domain, Respondent registered the rest of the domains referenced above and put up a pre-textual "investigative" site about Complainant. However, this site was rife with advertisements keyed to the Complainant's business.(Annex S and U.) This is an illegitimate use, designed to cover up Respondent's use of the domains to interfere with Complainant's business, and to profit through advertising revenue. After her pre-textual use commenced, Respondent registered names of Complainant's family members as part of her scheme.

[31.] The substance of the domains and Complainant's name are identical. Respondent additionally, and maliciously, registered <jenniferrandazza.com> and <nataliarandazza.com> – (the names of Complainant's wife and three year-old daughter). Respondent is not known by the domain and has no legitimate claim to them. Respondent may offer fanciful explanations, but there is no need for hypothesis or conjecture once the Panel examines Respondent's sites. (**Annex G, H, I, J, and K.**) The websites that Respondent associated with the domains infringe upon Complainant's and his family's rights.[1] Respondent's actions parallel the facts of *Societe Air France v. Bing G. Glu,* WIPO Case No. D2006-0834, in which the Panel found the *"disputed domain name www.sfr.org is being used by the respondent in a way that could derive revenue from the internet traffic generated through the Complainant's investments."*

[32.] Nor can Respondent's claims that the domains are a "parody" protect her illegitimate actions. If a domain on its face does not indicate that it will lead to the trademark or service holder of the name used, but is instead used **as legitimate** parody or criticism, then the domain **still** creates "initial interest confusion." *Jenner & Block LLC v. Defaultdata.com,* NAF Case No. FA0207000117310. When registering a domain, if respondent has falsely and misleadingly identified herself as complainant by using complainant's mark, respondent is not making a fair use of the mark. *Id.* In *Jenner,* the Panel found that, when respondent registered a domain that, on its face, appeared

---

[1] Most egregiously, the <nataliarandazza.com> domain name previously resolved to a web page discussing sexual activity, but Ms. Cox quickly directed it to a blank page once the media reported on her registration and use of a domain name corresponding to the name of a three year old child.

*Exhibit 2a*

to direct to a law firm, but instead directed to respondent's page criticizing the firm, respondent did not have a right to the domain. *Id.*   The Panel did not accept respondent's argument that his actions were ennobled by free speech concerns because the domain name created initial interest confusion. *Id.*   The Panel compared respondent's actions to intercepting telephone calls in order to speak to customers. *Id.*

[33.]   Similar to *Jenner*, Respondent's registration of Complainant's name and variations thereof and the names of his family members creates initial interest confusion for users who may at first believe they are visiting a site owned by Complainant or connected to Complainant's businesses.   Once they navigate to the page, the users will not be directed to a site run by Complainant, but will instead be on a webpage managed by Respondent.   Thus, in *Jenner*, potential customers will be intercepted prior to reaching Complainant's webpage.   Like respondent in *Jenner*, Cox has no legitimate interest in the domains.

[34.]   Complainant has shown that the "criticism" sites that Cox publishes are merely pre-textually populated with gibberish in order to try and create a false impression of them as "criticism sites."   Nevertheless, the registration and use of the domains is indefensible even if the sites found at them were *legitimate* criticism.   A criticism site, **even if legitimate and entirely noncommercial**, does not confer upon a domain name holder a right or legitimate interest if the domain name consists solely of complainant's name. *Joseph Dello Russo M.D. v. Michelle Guillaumin*, WIPO Case No. D2006-1627 (majority opinion); *Justice for Children v. R neetso / Robert W. O'Steen*, WIPO Case No. D2004-0175.

[35.]   Respondent will wrongly complain that the UDRP Complaint is an affront to her free speech rights.   However, the Disputed Domain Names point to blogs, which will remain online even if Complainant prevails. However, Complainant's research still suggests that the pages resolve to pay per click pages. See Annexes HH and II.

[36.]   Furthermore, Respondent has registered <fuckmarcrandazza.com> and <marcrandazzaisalyingasshole.com>, and <marcrandazzasucks.com>.   Complainant has not challenged her right to these domains, as they are more than simply Complainant's name.   Complainant's interest in the domains does not abridge

Respondent's free speech rights, but merely protects his legitimate interest in his personal name as a common law mark.

[37.]   Respondent's position that the disputed domains are "criticism sites" is unavailing. Respondent has a history of registering domain names that solely include their target's full names and uses link-bombing methods in an effort to increase her search results on search engines. (Annex V.)   Respondent then offers to provide "reputation services" to the subject of the domain in return for a fee. (Annex T.)  The websites are not "criticism sites" but  a pretext for Respondent's bad faith extortionate use.

[38.]   Complainant does not dispute Respondent's right to run a legitimate criticism site, but objects to the use of domain names that consist solely of Complainant's personal name to do so.  Complainant acknowledges Respondent's right to domain names that do  not  wholly  contain  only  the  Complainant's  name  (the  aforementioned "fuckmarcrandazza.com".

[39.]   Under the UDRP, once Complainant asserts that Respondent has neither rights nor a legitimate interest in the domain, the burden shifts to the Respondent to provide "concrete **evidence** that she has rights to, or legitimate interest in the domain name at issue." *Do the Hustle, LLC v. TropicWeb,* WIPO Case No. D2000-0624. Mere assertions, post-hoc rationalizations, and hypothetical uses are not "concrete evidence".

[40.]   Respondent lacks a legitimate claim to the domains.  The site found at the domain was initially a pay-per-click site, until Complainant raised the issue with Respondent, and then Respondent rushed to use the Disputed Domain Name for the extortionate pretext of offering "reputation management" services in return for a monthly fee.  In this way, Respondent intended to gain financially from the registration of the Complainant's name.  Even today, the domains direct (on an off and on basis) to PPC sites and have had advertisements keyed to the Complainant's business. (See Annex HH, Annex II, and Annex U).  When Respondent Cox used the domains to derive revenue from Complainant's name, her registration of that domain infringed upon Complainant's rights. *Societe Air France v. Bing G. Glu,* WIPO Case No. D2006-0834.

*Exhibit 29*

[41.]   No facts suggest any rights or legitimate interests in the domains. Respondent had actual knowledge of Complainant's name and his family members' names when she registered the domains.  Respondent registered these names in defiance of this knowledge because of the likelihood of confusion with Complainant's name, which would bring traffic to the site when people attempted to search for Complainant. Respondent did so in a scheme to try and generate money for herself, through advertising revenue and through extortion.  Therefore, Respondent registered the name in bad faith and cannot claim to have legitimate rights or interests.

[42.]   Complainant does not need to show actual confusion, only the potential for confusion. Where the domain is likely to cause "initial interest confusion", it is irrelevant that the users eventually realized that the site they reached is not the site they were seeking. *Tall Oaks Publishing, Inc. and Frank L. Slejko, Ph.D. v. National Trade Publications, Inc.*, NAF Claim No. FA94346 (ultrapurewater.com), *Mariah Boats, Inc. v. Shoreline Marina, LLC*, NAF Claim No. FA94392 (mariahboats.net).

[43.]   Marc Randazza or Marc J. Randazza or Marc John Randazza can only identify Complainant. Internet users who navigate to these domains would be misled to believe that the domains are, in some way, connected to and affiliated with Complainant, which is "initial interest confusion." *Covance, Inc. and Covance Laboratories Ltd. v. The Covance Campaign*, WIPO Case No. D2004-0206. Furthermore, there is nothing stopping Respondent from creating email accounts masquerading as Complainant, and then engaging in fraud by sending emails from addresses ending in @marcrandazza.com.  Since Respondent is a demonstrated extortionist, this is not only likely, but inevitable, if the requested relief is denied. Since Complainant is an attorney, doing so could cause untold harm to clients and the public.  Therefore, not only the Complainant's rights are at stake here, but the rights of many third parties.

[44.]   Panels find a likelihood of confusion even though users may soon discover the unlikelihood of a business relationship between Complainant and Respondent because Respondent gains website traffic from the establishment of the link via the confusingly similar domain name. See *National Football League Properties, Inc. and Chargers Football Company v. One Sex Entertainment Co., a/k/a chargergirls.net*,

WIPO Case No. D2000-0118 (chargergirls.com and chargergirls.net).  However, this will be even worse if Complainant creates bogus email accounts in order to defraud Complainant's legal clients.  If a party gets an email from "attorney@marcrandazza.com" it is unlikely that they will realize the fraud until it is too late.

[45.] The UDRP only requires that confusion could reasonably occur due to the domain. See *SGS Société Générale de Surveillance S.A. v. Inspectorate*, WIPO Case No. D2000-0025 (sgs.net).

**IV. The Disputed Domain Names have been registered and used in bad faith.**

[46.] Section 4(b) of the UDRP leaves it open to the Panel to find bad faith either by applying the four factors enumerated in that section OR by looking outside the four factors.  See, e.g., *Mansueto Ventures v. Jonathan Witte*, WIPO Case No. D2006-1479 (transferring the domain www.inc.mobi after engaging in a common-sense analysis of Respondent's pretextual arguments for registration); *Media General Communications, Inc. v. Rarenames, WebReg*, Case No. D2006-0964 ("The list of instances of bad faith in Policy, paragraph 4(b) is explicitly non-exclusive. The Panel must consider, as have several previous UDRP panels, whether the Respondent's apparent disregard for the likelihood that the Domain Name corresponded to a distinctive trademark is itself evidence of bad faith in the registration and use of the Domain Name."); *Thermo Electron Corporation v. Sven Camrath and Joachim Camrath*, WIPO Case No. D2001-1013 ("The circumstances enumerated in paragraph 4(b) of the Policy are not exhaustive: bad faith registration and use may be established in other ways. In *SportSoft Golf, Inc. v. Hale Irwin's Golfers' Passport* (NAF case FA94956) a finding of bad faith was made where the respondent "knew or should have known" of the registration and use of the trade mark prior to registering the domain name.").  Paragraph 4(b) of the UDRP outlines non-exclusive examples of bad faith, including 1) circumstances indicating that the person who registered the disputed domain name did so for the purpose of selling the domain name to the Complainant; 2) the person registered the domain name with the purpose of preventing the Complainant from registering the name (as the Respondent admits); 3) the registrant intended to disrupt the Complainant's business (as Respondent admits); and 4) the registrant attempted to attract Internet users for commercial gain by

16

creating a likelihood of confusion with the Complainant.   Here, the Respondent intended to achieve all four.

[47.]   Respondent's sole purpose for operating the domains using Complainant's name is to "Google bomb" Complainant in order to ensure that her sites, containing fabricated stories and incomprehensible rants, will appear near the top when his name is searched, and then her ads will generate revenue and her extortion plan will be more complete.  Respondent registered the domains to prevent Complainant from using his personal name as a domain, to profit from Complainant's name, and to harass Complainant and his family.   Respondent has engaged in this conduct previously, thus establishing a pattern of such bad faith conduct. See *Obsidian Finance Group v. Cox*, No. CV-11-57-HZ, (D. Ore. Jan. 23, 2012), Annex **V**.  In that suit, brought in federal court, a jury found that Respondent registered several domains using plaintiff's business and personal names to besmirch the plaintiff and his business by constructing the sites in such a manner that they would appear near the top of Google searches.  The jury awarded the plaintiffs in that case a total $2.5 million in damages.

[48.]   The *Obsidian* case is not the only time that Respondent has engaged in this behavior.  In fact, Respondent has engaged in a pattern of registering the domain names of attorneys for this purpose.  Respondent is a serial cybersquatter.  (Annex X.) Here, as in *Obsidian*, Respondent intended to disrupt and interfere with Complainant's business.   Respondent registered multiple domain names using Complainant's name in order to achieve this effect.  Respondent registered and used the domains in bad faith.

[49.]   All of the content contained on the sites constitutes extortion, witness tampering, or merely a pretext to sell advertising, all of which constitute bad faith.  A respondent cannot make a legitimate use of a domain name when such use is "merely a pretext for cybersquatting, or if bad faith registration and use of the domain name otherwise is indicated from the circumstances of the case." See *Martha Stewart Living Omnimedia Inc. v. Josh Gorton*, WIPO Case No. D2005-1109. In the *Gorton* case, even when respondent claimed to be operating the domain as a "fan site," the Panel found that because he had said he would sell the domain registration to the highest bidder, he was really engaged in a pretext of bad faith use and registration.

Exhibit 29

[50.]   Similarly, Respondent attempted to benefit commercially from the registration of these names by offering to provide "reputation management services" to Complainant after she registered his personal name.   Respondent went even further, for once Complainant refused to succumb to her extortion demand, Respondent tried to increase the pressure by registering not only Complainant's name, but the names of his wife and 3 year old daughter.[2]   The offering of these "services" was merely pretextual, as Respondent, herself, was the sole source of the false, negative comments made about Complainant. Respondent's registered the disputed domain names in an attempt to extort money from Complainant.  This cannot be good faith.

[51.]   Interestingly enough, once the media was made aware of Respondent's actions, and reported on it, Respondent came up with a story that she merely registered the domains, in order to pressure Complainant into refraining from testifying in a federal case. (Annex W.)  If Respondent's post-hoc "justification" is to be believed, then the registration and use were still in bad faith, as they would constitute the crime of "Witness Tampering" under 18 U.S.C. § 1512.

[52.]   Respondent places advertising on the pages, which are being used as pay-per-click sites for Respondent's financial benefit.  (**Annex S.**)  In fact, one of the PPC ads features a competing Las Vegas attorney. (Annex U.)  It is well established that PPC sites and domain parking pages are not *bona fide* offerings of goods or services. *Air Deccan v. Premium Domain*, WIPO Case No. D2005-0895; *Societe Air France v. Bing G. Glu*, WIPO Case No. D2006-0834.  Even if they were, creating a PPC website that trades off the good name of another could never be anything but bad faith under the Policy. Respondent has attempted to capitalize commercially on Complainant's reputation.

[53.]   Because Respondent registered the disputed domain names for the purpose of generating advertising money, extorting the complainant, and/or witness tampering, the domains were registered and used in bad faith.

---

[2] Furthermore, as noted above, <nataliarandazza.com> previously forwarded to an article containing descriptions of sexual activity, but Cox ceased forwarding it to this article after public scrutiny of her actions ensued.

[54.]   Furthermore, proof of Respondent's bad faith use of the disputed domain names can be shown through her "cyberflying" actions, transferring the domain name registrations from proxy to proxy in order to attempt to evade liability.

[55.]   A respondent cannot make a legitimate noncommercial or fair use of a domain name when such use is "merely a pretext for cybersquatting, or if bad faith registration and use of the domain name otherwise is indicated from the circumstances of the case." See *Martha Stewart Living Omnimedia Inc. v. Josh Gorton*, WIPO Case No. D2005-1109. Respondent claims that she registered the domain names to prove to Complainant that he was "stupid" for not registering his name first. This behavior does not show a legitimate use of the domain name, but rather, illustrates bad faith, as she admits that she registered the domains merely so that Complainant could not have them. See Policy, ¶ 4(b)(ii).

[56.]   Respondent's explanation for the domains being cyberflown is not credible and suggests further bad faith. Respondent transferred ownership in an attempt to avoid a situation, such as this one, where she is subject to a UDRP. This is not the first time Respondent transferred ownership to evade judgment. When Respondent first contacted Complainant regarding ownership of his domain, Respondent stated that she did not own the site "due to (her) current judgment." (Annex T.) This transfer of ownership is no different from the first. She is simply trying to evade justice. In fact, Annexes KK and LL demonstrate that she rotates her domain names in a constant "kiting" effort to evade enforcement. (Annex KK, depicting the WhoIs transfers of CrystalCox.com; and Annex LL, depicting the transfers of the disputed domain names.)

[57.]   These transfers prove the registration and subsequent use were in bad faith. *MB Financial Bank, N.A. v. MBBANK*, FA 644517 (Nat. Arb. Forum April 4, 2006) ("[C]yberflight [is a] tactic employed by bad faith cybersquatters."); *Group Kaitu, LLC, Darkside Productions, Inc. v. Group Kaitu LLC aka Manila Indus., Inc.*, D2005-1087 (WIPO January 6, 2006) ("Prior Panels have found [cyberflying] to be clear evidence of a respondent's bad faith under the [ICANN] Policy.

[58.]   Respondent used the domains to derive revenue from Complainant's name; her
registration infringed upon the Complainant's rights. *Societe Air France v. Bing G.*
*Glu*, WIPO Case No. D2006-0834. Respondent claims she never engaged in pay for
click advertising and does not make money off of the site; however, she also claims to
have transferred the domains to Mr. Bernstein in order to satisfy a debt to him, for
which she offers no further explanation. This further demonstrates bad faith. The
implication is that these websites generate revenue, and even currently, the websites
continue to forward to a pay-per-click site. (Annex II.) Furthermore, the domains
continue to be operated and managed by Respondent, even if the registration is falsely
placed in Bernstein's name. (Annex JJ.) This is a common tactic employed by Cox to
frustrate judgments. (Annexes KK and LL.)

[59.]   Respondent is a serial cybersquatter who frequently registers the personal names and
company names of attorneys and business people in an attempt to extort them and
profit from her registration and use of the names. (Annex X.) Respondent has a
pattern of registering domain names in bad faith.

**V. Conclusion**

[60.]   It bears mentioning that Complainant does not begrudge Respondent her opinion or a
forum for voicing it. Respondent has hundreds of domain names and hundreds of
websites where her vitriol will continue unchecked. Respondent, has ample ability to
express whatever ideas she wishes on other domain names she has, which also
incorporate Complainant's name, but are not the subject of this Complaint (e.g.,
<fuckmarcrandazza.com>,          <marcrandazzasucks.com>          or
<marcrandazzaisalyingasshole.com>).   Respondent's registration and use of the
Disputed Domain Names, however, is distinguishable.

**VII. Remedies Requested**
(Rules, Paragraph 3(b)(x))

[61.]   In accordance with Paragraph 4(i) of the Policy, for the reasons described in
Section VI above, the Complainant requests that the Administrative Panel appointed
in this proceeding transfer <marcrandazza.com>, <marcjrandazza.com>, and
<marcjohnrandazza.com> to the Complainant.

*Ex. 2q*

### VIII.  Administrative Panel
(Rules, Paragraph 3(b)(iv);  Supplemental Rules, Paragraph 8(a))

[62.]   The Complainant elects to have the dispute decided by a single-member
Administrative Panel.

### IX.  Mutual Jurisdiction
(Rules, Paragraph 3(b)(xiii))

[63.]   In accordance with Paragraph 3(b)(xiii) of the Rules, the Complainant will submit,
with respect to any challenges that may be made by the Respondent to a decision by
the Administrative Panel to transfer or cancel the domain name, to the jurisdiction of
the courts in Arizona – where the domain name registrar is located.

### X.  Other Legal Proceedings
(Rules, Paragraph 3(b)(xi))

[64.]   There are no other proceedings between the parties pertaining to the domains at this
time.

### XI.  Communications
(Rules, Paragraphs 2(b), 3(b)(xii);  Supplemental Rules, Paragraphs 3, 4, 12)

[65.]   A copy of this Complaint, together with the cover sheet as prescribed by the
Supplemental Rules, has been sent or transmitted to the Respondent on July 30, 2012
by e-mail.

[66.]   A copy of this Complaint has been sent or transmitted to the concerned registrar(s) on
July 26, 2012 by e-mail.

[67.]   This Complaint is submitted to the Center in electronic form, including annexes, in
the appropriate format.

### XII.  Payment
(Rules, Paragraph 19;  Supplemental Rules Paragraph 10, Annex D)

Exhibit 2G

[68.] As required by the Rules and Supplemental Rules, payment in the amount of USD $1,000 has been made by credit card.

## XIII. **Certification**
(Rules, Paragraph 3(b)(xiv);  Supplemental Rules, Paragraph 14)

[69.] The Complainant agrees that its claims and remedies concerning the registration of the domain names, the dispute, or the dispute's resolution shall be solely against the domain name holder and waives all such claims and remedies against (a) the WIPO Arbitration and Mediation Center and Panelists, except in the case of deliberate wrongdoing, (b) the concerned registrar, (c) the registry administrator, (d) the Internet Corporation for Assigned Names and Numbers, as well as their directors, officers, employees, and agents.

[70.] The Complainant certifies that the information contained in this Complaint is to the best of the Complainant's knowledge complete and accurate, that this Complaint is not being presented for any improper purpose, such as to harass, and that the assertions in this Complaint are warranted under the Rules and under applicable law, as it now exists or as it may be extended by a good-faith and reasonable argument.

Respectfully submitted,

/s/ RDG

Ronald D. Green, Esq.

Date:  July 26, 2012

Exhibit 2G

## XIV.   List of Annexes
(Rules, Paragraph 3(b)(xv);  Supplemental Rules, Paragraphs 4(a), 12(a), Annex E)

A.   WHOIS Records for the Disputed Domain Names

B.   GoDaddy.com, Inc. Registration Agreement

C.   Dispute Resolution Policy for GoDaddy.com, Inc.

D.   Current WHOIS Records for Additional "Marc Randazza" Domain Names

E.   Previous WHOIS Record for <jenniferrandazza.com>

F.   Previous WHOIS Record for <nataliarandazza.com>

G.   Webpage at <marcrandazza.com>

H.   Webpage at <marcjrandazza.com>

I.   Webpage at <marcjohnrandazza.com>

J.   Webpage at <markrandazza.blogspot.com>

K.   Webpage at <jenniferrandazza.com>

L.   Historical Registration of Disputed Domains

M.   New York Times Article about Respondent (Dec. 2011)

N.   Forbes Article about Respondent (Dec. 2011)

O.   New York Times Article about Respondent (April 2012)

P.   Forbes Article about Respondent (April 2012)

Q.   Corporate Registration of Marc J. Randazza PA

R.   Media Appearances of Complainant

S.   Pay-Per-Click Advertising on Disputed Domains

T.   Complainant's E-mail Asking for Domain from Respondent

U.   Las Vegas Attorney Pay-Per-Click Ad

V.   *Obsidian Finance v. Cox*, Order Denying New Trial

W.   Respondent's post about witness tampering

X.   Table of Respondent's Registered Domains of Personal Names or Businesses

Exhibit 25

AA.  Front Page of Complainant's Website

BB.  Complainant's Curriculum Vitae

CC.  About the Editor Page of Complainant's Blog

DD.  Site Statistics for Complainant's Blog

EE.  XBiz Article on Top 50 Newsmakers of the Year

FF.  Google ® Search of Complainant's Name

GG.  Composite of Complainant's Selected Media Appearances

HH.  GoDaddy Park Pages at Disputed Domain Names (July 26, 2012)

II.  Declaration of Laura Tucker in support of Annex HH

JJ.  Current Front Pages

KK.  Historical WhoIs Registrations for <CrystalCox.com>

LL.  Historical WhoIs Registrations for Disputed Domain Names